(No. 14543.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARVEY ROGERS, Plaintiff in Error.

*Opinion filed June 21, 1922—Rehearing denied October 5, 1922.*

1. CRIMINAL LAW—*what is sufficient proof of ownership in indictment for robbery—corporation.* Where an indictment for robbery alleges that the money taken was in the possession of a certain person as agent of the Western Newspaper Union and that it was taken from him by force and violence, proof of such facts will sustain a conviction even though the evidence may not show the corporate existence of the agent's principal.

2. SAME—*when defendant cannot complain of opening statement of prosecuting attorney.* A defendant is not entitled to a reversal of a judgment of conviction because of the opening statement of the prosecuting attorney that the prosecution would prove a confession which is recited in the attorney's statement but which was excluded by the court on the ground that it was not voluntary, where the defendant's counsel made no objection to the opening statement of the prosecution although they knew at the time that their client claimed the confession was not voluntary.

3. SAME—*when failure to find age of defendant will not cause reversal.* A judgment of conviction sentencing a defendant to the penitentiary for the crime of robbery will not be reversed because it does not appear in the record that the jury made a finding as to his age unless it appears from the record that the defendant was prejudiced by such failure, and where the record shows that the court was informed from the undisputed evidence that the defendant was nineteen years old there is no showing of prejudice.

4. SAME—*record must show that defendant was prejudiced by separation of jury.* A verdict will not be set aside on the bare assumption that the defendant may have been prejudiced by allowing the jury to separate and thereby giving them access to a newspaper containing an article about the trial, where there is no showing that the defendant was prejudiced or that any of the jury saw the article.

5. SAME—*confession extorted by "sweating process" is not admissible.* Extorting a confession by means of the "sweating process" is a violation of the law and of the prisoner's rights, and a confession forced by such tactics is under the law inadmissible against the prisoner on the trial, and where the record shows that a conviction was the result of admitting such confession in evidence the judgment will be reversed.

6. SAME—*when, only, should trial judge admit confession obtained by the police.* It is the duty of the trial judge in every case where he has reason to suspect that a confession has been extorted from the defendant to refuse to permit any evidence as to the confession until the State has examined every police officer and everyone present at such examination, so that the full truth may be disclosed.

7. SAME—*jury should be guarded against the influence of newspaper articles.* It is not the legal privilege of any newspaper or of any individual to get before the jury or in the hands of the jurors any character of article or utterances that tend to take away from a defendant a fair and impartial consideration of the evidence in the case, and the court should guard the jury with extreme caution against the effect of such articles or utterances.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding.

JOHN R. McCABE, (EDWARD N. SHERBURNE, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, CLYDE C. FISHER, and ALVA L. BATES, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error and Joseph Eagan were convicted in the criminal court of Cook county on a one-count indictment for robbery by the use of a gun. They were impleaded with Charles Conroy, Walter Buckley and Charles Olson. Only Rogers, Eagan and Conroy were tried in this trial, Conroy being acquitted. The charge in the indictment is, in substance, that they committed the crime of robbery with a gun on Louis Plomgren on February 25, 1921, and by force and violence took from his person and carried away money to the value of $8571, the property of the Western Newspaper Union, a corporation, which money was then in the care of Plomgren. Eagan disappeared during the

trial and before the verdict was rendered. Rogers, who was proved to be of the age of nineteen years at the trial, was sentenced to serve an indefinite term in the penitentiary, and he sued out this writ of error to reverse the judgment.

The following facts were proved by the People: The Western Newspaper Union has an office in the city of Chicago at 210 South Desplaines street, where it has a printing plant, machinery and paper stock. It operates its business through managers, cashiers and other officers appointed. It has a board of directors and a president elected by the board of directors. The board of directors and the resident operating head conduct the business. The proof also shows that the board of directors has held meetings as such, and that the Western Newspaper Union has a charter, which was at the time of the trial in Maine, and issued capital stock and has a stock-book and stock-ledger. It also has a secretary and treasurer, and pays its employees by checks drawn by the Western Newspaper Union. Louis Plomgren had been employed by the Western Newspaper Union for thirty-four years, and on February 25, 1921, was its cashier and credit man. On the morning of that day, about twenty minutes after nine o'clock, he left the office of the Western Newspaper Union, accompanied by Joseph Smith, and proceeded to the Mercantile Trust and Savings Bank, at the southwest corner of Jackson boulevard and Clinton street. At the bank he received for said company, which he tied up in a package of brown paper and put rubber bands around it, $8571, lawful money of the United States. The money made quite a large package, which was all in currency, and contained twenties, tens, fives, twos and one-dollar bills. After receiving this money Plomgren and Smith started back to the Western Newspaper Union office, Plomgren carrying the package of money under his left arm. They walked west on Jackson boulevard to Desplaines street, crossed Jackson boulevard and went north on Desplaines to Quincy street, near which point Rogers, Eagan

and others jumped out of an areaway and in front of Plomgren and Smith and held guns in their faces, demanding that they throw up their hands and that they give up the package of money. Rogers pointed his gun at Plomgren, and when he demanded the money Plomgren ducked his head and started to run, but others of the robbers followed him and beat him over the head with guns and knocked him to the sidewalk, upon which he dropped the package. The blows rendered him unconscious for a short time. The robbers escaped in a Mercer touring car which they had standing at Quincy and Desplaines streets, the license number of which was 30297, which was noted by Smith. After the robbers left, Smith went to the rescue of Plomgren and raised him off the sidewalk. The package of money which he had under his arm was gone, and they never saw it from that day to the day of the trial. Both Smith and Plomgren positively identified plaintiff in error as one of the robbers, and stated that they both had a good look at him while he pointed the gun at Plomgren. They were able to identify him because of his unusual appearance, and particularly with reference to his eyes and very blonde hair. He wore a cap, a kind of brownish suit and a dark overcoat. Plomgren said his peculiar looks were due to his small, beady eyes and blonde hair. Smith described his eyes as reddish, teary or watery. Neither of them had ever seen or known Rogers before, but they had a good look at him on the day of the robbery and saw him frequently thereafter and entertained no doubt as to his identity.

The defense of Rogers was that of an alibi and former good reputation, the latter being proved by something like half a dozen witnesses. His brother, William D. Rogers, testified, in substance, that he was in the motor transportation business, and that defendant was employed by him and his partner on the morning of the robbery and was driving one of their trucks and delivering; that he worked all that day, and that between the hours of nine and ten o'clock

on that morning he started from Kedzie and Taylor streets with a car of glass; that witness helped him load that load and also a second load, the first being loaded about a quarter before nine o'clock and the second at 12:15. His mother gave corroboration by testifying that she recalled particularly that on that day defendant went to work with his brother. The alibi is not shown to be altogether inconsistent with the defendant's guilt. It does not appear at just what hour and minute the robbery occurred, but it must have taken place about ten A. M. of that date. The defendant testified the same as his brother on the question of his alibi. He denied all participation in the robbery and all knowledge thereof. On cross-examination he stated that he knew Eagan but had not known him prior to February 25, 1921, the day on which he was arrested. Buch Anderson, a real estate man, testified in rebuttal that he knew Rogers, and knew Eagan as Kearns, and that previous to the hold-up he saw Rogers and Eagan together on the back porch at 1263 Washington street, and that there was another Rogers about thirty-two years old there at the same time, but witness does not know if he is a relative of the defendant.

The first contention made by the plaintiff in error is that the evidence does not show a completed crime of robbery, but, at most, an assault with intent to commit robbery. This contention is made upon the ground that neither Smith nor Plomgren was able to state that he saw or knew who took away the package. This clearly appears to have so happened because at the time of the taking they were separated and while Plomgren was partially unconscious and Smith was detained with a gun in his face and could not go to Plomgren's rescue until the robbers left. But this proof is supplied by circumstances. When Smith did go to Plomgren the latter was down and out, the robbers gone and the package of money, too. The robbers were after money,—the particular package in question,—and that is what they demanded. They were not interrupted in the

hold-up by anybody, and it follows as a moral certainty that they did not voluntarily go off and leave the package on the sidewalk after they made Plomgren drop it. Jurors, as well as courts, are permitted to use their common sense in drawing conclusions that naturally are to be drawn from facts proved.

· There was no failure to prove ownership as alleged. The proof in the record shows that the Western Newspaper Union is a corporation by user. (*People* v. *Buckman,* 279 Ill. 348.) Even if the proof had not established the existence of the corporation, the allegation that the Western Newspaper Union is a corporation and was the owner of the property might be regarded as mere surplusage. The indictment alleges, also, that the money was in the possession of Plomgren as the agent of the company and that it was taken from him by force and violence. This amounts, in robbery, to a sufficient charge that the property was the property of Plomgren, possession of property being a sufficient ownership under this offense as against the robber. Where, in robbery, ownership is properly alleged in one person and proved, the indictment and the verdict of guilty will not be held bad because the indictment contains a further allegation of ownership in another person that is not proved, or where the further allegation is that the property belongs to some named company that is not proved to be a corporation or a person in law. (*People* v. *Knox,* 302 Ill. 471.) In this case ownership was sufficiently proved in both Plomgren and the corporation to sustain the charge of robbery, and there is no variance or failure to prove ownership as alleged. The gist of the offense is the force or intimidation used in taking from the person of Plomgren, against his will, property belonging to him or in his care for another.

In his opening statement the State's attorney made the following statement to the jury: "These men got into an automobile, right after completing the robbery, which was standing near the curb with the engine running, and started

south, and at Twenty-fourth and Michigan this machine collided with an automobile belonging to the fire chief of the city of Chicago. Then the men abandoned their car and ran to 1811 Prairie avenue and deposited in a victrola there some revolvers and $100 in currency. * * * The police went to this place at about six o'clock in the evening, and while there there was a telephone call, and the police listening heard somebody say: 'This is Joe Eagan's friend; there is something the matter with your victrola; look and see what is the matter with it.' The police heard this and went there [to the victrola] and got four guns and $100 in currency. This man also said [over the telephone] that he would be there in about forty-five minutes. They waited quite a while and there was no other conversation. In the morning Rogers came over to the garage and the police took him in. * * * On February 26, that is the day they got McMahon and Eagan and Rogers in the office of Lieut. Norton, of the police department, * * * and Mr. Plomgren made a complete statement of how the robbery was done. * * *. Rogers was pointed out by Mr. Plomgren when he was asked if he knew anyone in the room, and Rogers was asked also, and he said that that was the man 'we took the pay-roll from,' and the court reporter who took the statements down will be here to testify what was said by the parties at the time."

The first part of this statement as to how the robbers drove away and collided with the fire chief in his automobile was proved, and it was also proved that the robbers there left their car and ran away. It was also proved that $100 in currency, in one-dollar bills, and four revolvers, were found in the victrola in the garage, and the police found this out in some manner by catching the conversation over the telephone, as aforesaid. The court properly refused to allow the proof to go to the jury (or rather excluded it) that related to the victrola and its contents and

as to what was said and done in the garage, because there was not sufficient proof to connect Rogers with the conversations over the phone. The confession of Rogers that he was with the party that took the pay-roll from Plomgren was also excluded by the court, because there was evidence of complaint before other judges before this trial began that Rogers had been "sweated" and beaten until he made the confession, and because a witness before the trial judge testified that Rogers had a discolored face. The trial judge properly and persistently refused to allow evidence of the confession to go to the jury, clearly on the ground that the evidence satisfied him that Rogers had been beaten into submission to force a confession. He was warranted in so doing unless all the police department men engaged or present at the sweating of Rogers were called as witnesses and satisfied the court in good faith that the confession had not been so obtained by them. Instead of doing this, the assistant State's attorney contented himself with examining the man who knew the least about what had taken place, Plomgren, who testified that Rogers answered readily and apparently voluntarily and willingly. But he did not come onto the scene, apparently, until the police had succeeded, by fair or foul means,—the court was not advised which,—in getting Rogers into a humor to confess.

The State's attorney was allowed, without objection by the defendant's counsel, to make reference to the confession in his opening statement. We are not authorized to say that the opening statement was not made in good faith and upon the assurance that the State would be able to show a voluntary confession, without intimidation, hope or promise. Defendant's counsel evidently knew as well at the time the opening statement was made as he did when the evidence was offered, that there was a claim by his client that the confession was not voluntary but was the result of violence by the police, and it was their duty to be on their guard and to object to the opening statement if they did

not want their client prejudiced thereby. There is absolutely no fault to be found with the court in its rulings on the conduct of counsel in relation to these matters, unless it was a failure to fine and jail the assistant State's attorney for his persistence in offering to prove the confession by the same witness and by other witnesses after the court had ruled it improper without first making a clean record to the effect that the confession was voluntarily and willingly made and not forced by the criminal practices of the police. The court persistently on his own motion, without at first any objection being made on the part of defendant's counsel, stopped the State's counsel and informed him that such evidence was not admissible and that it had already been ruled out. The court did this four distinct times, the last three accompanied with objections of the defendant's counsel. The court thus succeeded in absolutely preventing the witnesses from getting any part of the confession before the jury. The nearest a witness came to testifying to a confession was when he stated that defendant made a statement, except one voluntary statement made by Plomgren before the jury retired for the court to hear evidence as to whether or not he would admit the confession. This voluntary statement was to the effect that the defendant made a confession, which was not in response to the question asked him and without intimating what the confession was. The court promptly excluded this statement with the direction to the jury to disregard it entirely. Our conclusion is that the defendant is not entitled to a reversal of this judgment on account of the opening statement of the assistant State's attorney. His counsel by their silence permitted such statement and he cannot now complain. Besides, we do not think a new trial would result otherwise than in a conviction under the evidence in the record.

The court excluded the evidence relating to the money and the guns found in the victrola in the garage because the evidence did not sufficiently connect the defendant's conduct

or actions with those occurrences, and the defendant has no cause of complaint of the attempt to introduce such evidence by the People.

The defendant on his cross-examination testified to one singular piece of evidence if he was not connected in any way with the hold-up and the transactions at the garage aforesaid. Without objection on his part he testified that he was arrested at 1811 Prairie avenue,—the place where the money and revolvers were found in the victrola. He further stated that he did not have a telephone conversation with 1811 Prairie avenue prior to the time he went there. He then stated that he had a telephone call from a man who said over the telephone that he was A. Fenwick, who asked him to come to that garage. He made no statement to the effect that he did not know who Fenwick was. He did not even volunteer the information why he should answer such an indefinite call. He was not pressed to do so by his counsel or by the People, and there were no further efforts thereafter to introduce the evidence in relation to the victrola and garage.

There is also complaint that the jury did not by their verdict find the age of the defendant. The argument is that the court would not know or be informed how to exercise its discretion properly in sentencing the defendant,— whether to the reformatory or penitentiary. The court had such a discretion, as the defendant was proved to be only nineteen years of age; but we must assume that the court knew as well from the evidence in the record that he was nineteen years of age as if the jury had so found. The evidence in the record is positive and clear that the defendant was of the age of nineteen years. It was testified to by his mother, and there was absolutely no other evidence on the subject. We have heretofore held that a judgment of conviction sentencing a defendant to the penitentiary will not be reversed merely because it does not appear in the record that the jury made a finding as to his age. It must

appear from the record that the defendant was prejudiced by such failure, and the showing in the record as to what the age of the defendant is dispels all doubt of such prejudice. *People* v. *Simmons*, 299 Ill. 201.

The plaintiff in error finally argues that he was prejudiced by the printing of the following article, during the trial, by the *Herald-Examiner*, a morning daily newspaper printed in Chicago and having a circulation of four hundred thousand daily, to-wit:

⌐ *"Cops protest Court Ban on Confessions.*

"When a Chicago police official yesterday heard Judge Fitch of the criminal court had ruled he would not allow confessions of prisoners to be introduced as evidence in trials, he said 95 per cent of the work of the department will be nullified if the policy is permitted to prevail. The judge explained he was acting in accordance with a Supreme Court ruling given in the case of Nick Viano, hanged recently for murder. The court held that a confession obtained after long mental and physical fatigue should be construed as having been forced. It was pointed out by the police official that few, if any, prisoners confess except after lengthy examination.

" 'We are permitted to do less every day,' continued another official. 'Pretty soon there won't be a police department.' " |

It further appears that the jurors in this case were allowed to separate and that the foregoing article had reference to this particular trial. There is no showing in the record that any juror saw this article before the trial was concluded or afterwards. There is therefore no sufficient showing for the setting aside of this verdict. We have frequently ruled that we cannot and will not set aside a verdict on the bare assumption that the defendant may have been prejudiced on the trial, in the absence of evidence showing such to be the fact.

In view of the sentiments expressed in the above article by the police department we deem it proper to give this article further notice although not necessary to a decision of this case. The sentiment so expressed confirms a preconceived opinion of this court, or at least of several members thereof, that it has been the practice of the Chicago

police in a number of cases to extort confessions from suspects arrested by them by means of what is called "the sweating process," the meaning of which is well understood without further explanation. This sweating process has no doubt been accompanied in some cases by violence or beating of the suspect into making a confession. It is not the right of a policeman or sheriff or any officer who has the custody of a prisoner to resort to such tactics to secure a confession. It is absolutely a violation of the law and of the prisoner's rights, and a confession that is forced by such tactics is under the law absolutely inadmissible against the prisoner on the trial, and in this court it is not possible for the People to sustain a judgment in any criminal case where the record shows that it was had on a confession so obtained. The practice of punishing a suspect by blows or other violence when he otherwise refuses to confess is a violation of the criminal law itself and renders a policeman subject to criminal prosecution for such conduct. It is just as much the duty of a State's attorney to prosecute an officer who has thus violated the law as it is to prosecute any other man charged with crime. It is the duty of the policemen of Chicago to do all in their power to honorably and in a legal way secure evidence against parties who violate the criminal laws in the city, and there is plenty for them to do in this line in all cases. The legitimate way is to get out in the field where the crimes are committed and hunt up legitimate evidence against the parties who commit the crimes, and at the same time respect the constitutional and legal rights of suspects arrested for crime. A conviction secured by the brutal and criminal practices already mentioned is not in the interest of putting down crime but quite to the contrary. Its natural tendency is rather to increase crime and absolute disrespect for the law and for the courts. We can conceive of no more beastly and criminal practice than the securing of convictions in the manner indicated. No self-respecting citizen, and certainly no law-

abiding citizen, can stand for such a practice after he has well studied the question. It is the most dangerous and the most uncivilized practice imaginable to allow the police to go out and arrest a man or a boy upon mere suspicion that he has committed a crime and for days subject him to the sweating process and to violence until he finally gives up and confesses in order to escape the torture to which he is being subjected. The guilt or innocence of such a suspect would necessarily be determined by the first guess of the police as to who was the real criminal, and if the police made a mistake, conviction of innocent men and boys would necessarily result from such practice.

We desire to say, in conclusion, that we have not volunteered these closing remarks for the purpose of criticising or abusing anyone, but for the purpose of emphasizing the fact that such practice must not be resorted to with the understanding that it can have any sort of favor by this court. Trial judges ought not to be criticised when they are following the law and trying cases in a legal and orderly manner. And we may further say that the determination of the judge in this case to do his legal duty, even at the expense of severe and unjust criticism, is all that has saved this judgment from a reversal, and he was barely able to save it from such a fate owing to the persistence of the State in its efforts to get before the jury incompetent evidence. It is the duty of the trial judge in every case when he has reason to suspect that a confession has been extorted from the defendant, to absolutely refuse to permit any evidence as to the confession until the State has examined every police officer and everyone present at such examination, so that the full truth may be disclosed; and it is not the legal privilege of a powerful newspaper or any other newspapers printed in the jurisdiction where the trial occurs, or the privilege of any individual, to get before a jury or in the hands of a jury any character of article or of utterances that would tend to take away from a defendant

a fair and impartial consideration of the evidence in the case by the jury, and the court ought to guard the jury with extreme caution against the effect of such articles or utterances.

For the reasons aforesaid the judgment in this case is affirmed.

*Judgment affirmed.*

---

(No. 14474.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.*
C. R. TOMBAUGH, Exr. *et al.* Appellees.

*Opinion filed April 19, 1922—Rehearing denied October 5, 1922.*