(No. 30403.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAYMOND DAVIS, Plaintiff in Error.

*Opinion filed January 22, 1948—Rehearing denied March 15, 1948.*

FRANK A. MCDONNELL, (WILLIAM L. CARLIN, and LOUIS A. ROSENTHAL, of counsel,) all of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, of Springfield, and WILLIAM J. TUOHY, State's Attorney, of Chicago, (JOHN T. GALLAGHER, MELVIN S. REMBE, and W. S. MIROSLAWSKI, all of Chicago, of counsel,) for the People.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

Raymond Davis and Fred Van Meter were indicted on March 13, 1946, for armed robbery of Alberta Duncan. Both pleaded not guilty and waived a jury. The public defender was appointed by the court as counsel for Van Meter, and Davis was represented by his own attorney. They were tried on April 25, 1946, in the criminal court of Cook County and found guilty. Van Meter was given a sentence of from three to five years' imprisonment while Davis was sentenced to prison for a term of fifty years to life. A motion for new trial and one in arrest of judgment were made by Davis, and overruled. He is here on writ of error.

The prosecuting witness testified that about 9 P.M. on the evening of January 23, 1946, while walking on Fifty-ninth Street between Wabash and Michigan avenues in Chicago, she was accosted by Van Meter and Davis; that Davis hit her in the pit of the stomach and then the two of them forced her to accompany them down the alley; that Davis had a knife, with which he threatened her; that they stopped in back of an apartment house where Davis and Van Meter then took her fur coat, rings, wrist watch, cash and fountain pen; that Van Meter then left with her property, but Davis remained and forced her into a basement, where he raped her; that she next saw Van Meter on February 18, 1946, on an elevated train; that she and her husband had him arrested; that she saw Davis that same evening at the police station; and that she was present the following day (February 19, 1946,) when Van Meter and Davis made statements. In corroboration of her testimony, the State introduced the testimony of Richard Duncan, her husband, who trailed Van Meter with her on the night of February 18, 1946, and helped her call the police; Grace Lee Walter, who testified that she bought a fur coat, identified as belonging to Alberta Duncan, from

Van Meter some time in February, 1946; and two police officers, Louis Abbott and James Foster, who testified to the circumstances surrounding the taking of statements of Van Meter and Davis. The statements were identified and introduced in evidenced as confessions, over the objection of plaintiff in error.

Davis, testifying in his own behalf, denied any participation in the robbery and ravishment, and explained his written statement by saying that it was extorted from him by third-degree methods which left him weak and helpless, and fearful of his ability to withstand any further abuse. Davis presented two character witnesses, and also his mother, who testified that at the time of the robbery he was at home with her.

Van Meter, the codefendant, also took the stand, and, in the language of the record, "testified in his own behalf." The substance of his testimony is so unusual as to merit detailed attention. He first, under the questioning of his counsel, the public defender, admitted all of the facts of the robbery, and testified that Davis was with him at the time. He then admitted making a statement to the police, and said that everything in it was true, except the part about Mrs. Duncan's ravishment by Davis, concerning which he had no personal knowledge. This testimony by the codefendant apparently took Davis's counsel by surprise, and he cross-examined Van Meter carefully twice. On the first cross-examination, Van Meter stood by his story, and added only that he had been beaten and abused by the police prior to signing his original statement. The public defender then re-examined his client, and obtained a further admission of guilt, although the public defender continued to insist that Van Meter was pleading not guilty. At the request of Davis's counsel, the court then adjourned for the day, and on the following day Van Meter was again cross-examined by Davis's counsel. This time Van Meter admitted talking to the public defender about the number

of years' sentence he was going to receive, but the court refused to admit testimony as to any promises which had been made by the public defender. Van Meter was, however, permitted to testify that he made his original statement to the police on the basis of an agreement that if he did so, he "wouldn't get so much time." He further testified that his previous statements from ·the witness stand implicating Davis were false, and were made "because I couldn't bring the other one that put me up to it." The public defender then examined him again, and elicited the further testimony that his signed statement made to the police was involuntary, although it was true as to him (Van Meter), but that it was false as to Davis's participation in the robbery.

Plaintiff in error's analysis of the evidence Van Meter gave is, that it shows there was collusion among the prosecuting attorney, the police and the public defender, by which it was sought to obtain a comparatively light sentence for Van Meter at Davis's expense. There is no doubt that plaintiff in error was taken by surprise when his codefendant, who was pleading not guilty, took the stand for the apparent purpose of admitting his guilt and implicating Davis. Van Meter's statements, however, on the second day were · clearly to the effect that he had falsely testified against plaintiff in error in accordance with a bargain he had made with the police, who had promised him a light sentence.

When police officer Louis Abbott was on the stand the public defender asked him "As to the defendant, Van Meter, did he fully co-operate with you and with the police department at all times?" The answer was, "He did." Van Meter testified "I was told in the police station to say, when I got up on the witness stand, that Raymond Davis was with me." On the hearing as to the degree of punishment, Block, the public defender, stated to the court with reference to Van Meter, "he came in and, in effect, plead

guilty. It was no contest. He came in and told his story. He co-operated with the police throughout this entire matter, as Mr. Abbott testified when he took the stand." The court at one time during the discussion, referring to Van Meter, said, "It seems singular that a policeman testified that he co-operated with the police." In testifying with reference to the statement signed by him, Van Meter said, "I made that statement because I understood that I wouldn't get so much time. I made that agreement with the police. * * * They were trying to find out who was the other fellow. That is what they beat me for. I didn't tell them that until I was beaten. That is why I made a statement."

Plaintiff in error testified with reference to the confession signed by him that his signature was placed thereon because of punishment given him and fear of a repetition of that punishment. He testified, as shown by the abstract, that while he was incarcerated, officer Abbott asked him if he knew anything about the robbery, and when he said he did not, the officer called him a liar and told him that he would tell a different story before four o'clock that afternoon and told plaintiff in error he was going to kick his teeth out and said, "When this hall clears out, I am going to break your neck." He further testified "Abbott and Foster and a couple of other officers were in that room. I don't know who the other officers were. * * * Officer Abbott runs back to the door and told me that I didn't have but a few more minutes, because the station was almost cleared out, and he would begin to work on me. Then they carried me back to a lock-up on the first floor and I stayed there an hour. Then two police officers came in, two plain clothes men, and they slipped a blindfold over my eyes. They handcuffed my hands behind me and they began to beat me in my stomach. I believe that I could identify those police officers. I never saw them in this courtroom. I would be able to identify them if I saw them. After they put the blindfold on me, I do not

know who struck me. They struck me with their fists until after I fell, and then someone kicked me in the stomach. * * * I was in a state of fear; I was weak, I had had nothing to eat, no water. They refused to give me food and water, and I was very weak and when they began to beat on me, I passed out. * * * Two police officers were there when I came to. I do not know who they were. * * * Abbott wasn't there. Foster wasn't there. * * * I signed it because he had threatened me that he was going to put me back there and whip me again. When I say 'he' I mean officer Foster. I took into consideration the fact that I had been beaten and rendered unconscious by unknown persons * * *. I signed it involuntarily to keep them from beating me again."

Officer Abbott testified he saw plaintiff in error about ten o'clock on February 18. At about twelve o'clock that evening was the last time he saw Davis until one o'clock the next day; that he turned him over to the lockup keeper of the 18th district at twelve o'clock; that he was at the station the next day when Davis was brought in; that when he first went into the room Leon Wright and Jim Foster were in the room; that Captain Thomas Alcott and Bill Weil, a police officer, were also in the room. Abbott and Foster were the only officers who testified. Abbott denied that he whipped Davis or made any threats or promises to him. He said, "No one in my presence abused him in any way or made any promises to him. * * * I did not do anything to him. No one has accused me. * * * I don't know what happened in these two gaps of his absence from my presence. I couldn't tell you how many police officers there are in that station." Foster testified that he at no time struck or threatened or made promises to Davis. He testified "I couldn't say that he was treated well only in my presence. I know nothing of what happened to him before he came to me." No other officer testified in denial of the treatment testified to by Davis.

The two plain-clothes men who slipped the blindfold over his eyes did not testify nor were they in court. Davis said he would know them if he saw them. Davis's statement was made in the presence of officer Leon Wright and Clifford Phillips. Neither of these testified.

On a hearing to determine whether a confession was made voluntarily or as the result of fear, the burden of proof is upon the prosecution. (*People* v. *Holick,* 337 Ill. 333.) We have repeatedly held that a court is warranted in excluding a confession unless all of the police officers engaged or present at the sweating of the accused are called as witnesses, and that the court has no right to disregard the testimony of the accused, showing that a confession was forced by threats and physical violence, without a specific denial of the facts to which he testified. *People* v. *Holick,* 337 Ill. 333; *People* v. *Spranger,* 314 Ill. 602; *People* v. *Sweeney,* 304 Ill. 502; *People* v. *Rogers,* 303 Ill. 578.

. The general rule is that unless voluntarily made a confession cannot be admitted in evidence. (*People* v. *Buckminster,* 274 Ill. 435.) A confession is not voluntary where any degree of influence amounting to duress is used to obtain it by those having authority over the person of the accused, and a confession so obtained must be excluded because the law cannot measure the effect of such influence. *People* v. *Heide;* 302 Ill. 624; *Robinson* v. *People,* 159 Ill. 115; *Miller* v. *People,* 39 Ill. 457.

Without the confession statements of the defendants in evidence, the case would have been very close on the facts. There was no specific denial of the several acts of mistreatment of Davis and no excuse is shown as to why the other officers implicated were not called. The statement of Van Meter was made under a belief that he would be shown leniency. He said it was made under that belief and was untrue insofar as Davis was implicated in the crime. If his testimony as to the falsity of his confession

concerning Davis is true, then Davis had no part in the crime. If it is not true, then his testimony that implicates Davis in the crime is not worthy of belief. Confessions obtained through either hope or fear are not properly admissible, as they are not voluntarily made. *People* v. *Goldblatt*, 383 Ill. 176; *People* v. *Frugoli*, 334 Ill. 324.

Under the facts and circumstances presented by this record, it was error as against Davis to admit in evidence these signed statements. In our opinion, plaintiff in error did not receive the fair and impartial trial to which he was entitled under the law.

The judgment of the criminal court is therefore reversed and the cause remanded for a new trial.

*Reversed and remanded.*