(No. 42260.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. EUGENE ARMSTRONG, Appellant.

*Opinion filed April 17, 1972.—Rehearing denied May 25, 1972.*

UNDERWOOD, C.J., dissenting.

ROBERT S. BAILEY, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and ROGER S. MATELSKI, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Eugene Armstrong, the defendant, and Clifton Hill were indicted in the circuit court of Cook County for the murder and armed robbery of Charles Pollard which occurred in the early morning hours of December 14, 1967. Their cases were severed and on January 15, 1969, a

jury found the defendant guilty of both charges. On the jury's recommendation, the trial judge sentenced him to death on the murder charge. The trial judge also sentenced him to not less than 19 nor more than 20 years imprisonment on the armed robbery charge.

It is undisputed that at approximately 6 A.M. on December 14, 1967, Charles Pollard, a plainclothes Chicago police officer, was found dead in an alley behind his residence in Chicago. An autopsy revealed that he had been fatally shot by a .32 or .38 caliber gun. His empty wallet was found near his body, and his service revolver and wristwatch were missing. They were never found, nor were any guns discovered that belonged either to Clifton Hill or the defendant.

The defendant was arrested at about 6:30 P.M. on December 15, 1967, and held in custody thereafter. At approximately 3:30 A.M. on December 16, he made a written statement to a Cook County assistant State's Attorney. Defense counsel moved to suppress this statement and any other statements made by the defendant at or after his arrest.

At the beginning of the statement the defendant was advised of his constitutional rights and the defendant indicated that he understood those rights and nevertheless wanted to make the statement without availing himself of any of those rights.

In the statement, Armstrong told how he and Clifton Hill had committed armed robbery upon a man who turned out to be police officer Charles Pollard. He stated that Hill had shot Pollard as they tried to escape. They had taken $23 and a watch from the victim. Armstrong sold the watch. He also stated that he later told Ronald Walker of the crime after he learned that the victim was a police officer. At the conclusion of the statement, Armstrong indicated that he had been advised of his rights four or five times during his detention, and that he had been treated "okay" at the police station.

After a hearing at which witnesses were heard on

behalf of both the State and the defendant, the trial court denied the defendant's motion to suppress and ruled that the defendant's oral and written statements to the police and the State's Attorney would be admissible at trial.

Other than the statements made by the defendant while he was at the police station, the only evidence which directly related to his participation in the robbery and killing of Charles Pollard was the testimony of three of the State's witnesses. These witnesses were Vernon Walker, Ronald Walker, and Rosemary Walker, who were brothers and sister.

Vernon Walker, age 21, testified that Armstrong came to his bedroom when he was there on a Wednesday in mid-December 1967, although he didn't remember the date. At that time Armstrong told him that he needed money and that he "may go rip someone off," which means to rob someone. Armstrong then placed two guns in the closet in Vernon's room. That evening Armstrong returned to the room, changed his clothes and told Vernon that he was going to "rip someone off." After midnight Armstrong again returned to the bedroom and told Vernon that he had "stuck up a guy" and taken a watch, a ring, and some money. Vernon then asked him if he could wear the watch, and Armstrong gave it to him. Later that morning Arnold Hill came to Vernon's home, and Vernon gave the watch to Hill. Vernon described the watch, and his description matched that of the victim's watch as it had been described by other witnesses. The next Friday Vernon saw Armstrong in a tavern and told him that it was "a cop he had ripped off." Armstrong did not respond to this remark.

Rosemary Walker, age 20, testified that she saw Armstrong at her home on a Wednesday in mid-December 1967. She first saw him there at about 5:30 P.M. Armstrong then left her home, but he returned around 8 P.M. with Clifton Hill. Armstrong changed his clothes and told her that he was going to rip someone off.

Ronald Walker, age 19, testified that he saw Arm-

strong on Thursday, December 14, 1967, at the home of Arnold Hill. He saw Armstrong and Clifton Hill counting some money and displaying guns at that time. Later that day he saw Armstrong in a tavern. He testified that Armstrong then told him that he and Clifton Hill had robbed and shot a man that morning, but that he didn't believe Armstrong at that time. Commenting on a newscast on the tavern's television later that night, Armstrong told Ronald that "the man the newsman said got shot, it was him and Clifton Hill that did that." Armstrong then asked Ronald if he could leave a gun at his mother's house, but Ronald refused to allow him to do so.

On appeal the defendant has contended, *inter alia,* that his conviction should be reversed because of (1) error committed by the trial court in denying his motion to suppress the confessions made by him, (2) an improper limitation of defense counsel's cross-examination of Vernon Walker, and (3) prejudicial remarks made by the prosecutor during his closing argument to the jury.

The only one of these contentions that we find it necessary to consider is the first, for it is clear that the defendant's statements should have been suppressed because of failure of the prosecution to call all material witnesses connected with those statements. The conduct that gave rise to the second and third contentions is not likely to recur upon a new trial.

At the hearing on the motion to suppress, eleven police officers who were present at the arrest or subsequent interrogation of the defendant testified on behalf of the State. Several of them testified that they had advised the defendant of his constitutional rights and all of them stated that they had not seen any police officer strike or physically abuse the defendant. The assistant State's Attorney who took the defendant's statement, and the court reporter who transcribed it, also testified that the defendant was advised of his rights at the time of that statement and that he had stated that he understood those rights and that he had been previously advised of his rights.

All of the State's witnesses testified that the defendant did not have any cuts or bruises during the time he was held in custody.

The defendant testified that he had been beaten by several police officers at the time of his arrest and while he was held in custody at the police station. He further testified that his statements were made only after these repeated beatings, and that he had never been advised of his rights prior to the time that the assistant State's Attorney arrived. He also testified that he told the assistant State's Attorney that he had been treated "okay" and that he had been previously advised of his rights only because he was afraid of further beatings if he did not do so. The defendant's mother, stepfather, sisters, and girl friend testified that they saw the defendant after his interrogation at the police station and that he was badly bruised and cut after the interrogation, while he had not had any such bruises before his arrest.

During the hearing on the motion, defense counsel objected to the State's failure to call several police officers as witnesses. Among the officers who were not called by the State were Detective Lenz, who interrogated the defendant at the police station, and Officer Jackson who, the defendant testified, had beaten him at the time of the arrest. Defense counsel specifically listed the names of several other police officers whom he claimed had participated in the defendant's arrest or were present during his interrogation.

The State sought to explain the absence of Detective Lenz by the testimony of Detective Shine who stated that Lenz was on vacation and that he could not reach him. It sought to explain the absence of Officer Jackson by the testimony of Officer Johnson that he did not know where Jackson was but that "he should be on furlough." It did not attempt to explain the absence of the other officers named by defense counsel.

This court has consistently held that when the voluntary nature of a confession is brought into question

by a motion to suppress, the State must produce all material witnesses connected with the taking of the statements or explain their absence. As was stated in *People v. Wright (1962), 24 Ill.2d 88, 92,* "The burden of proving that a confession is voluntary is one which the State must assume when the admissibility of a confession is questioned on the grounds that it was coerced. Only by producing all material witnesses connected with the controverted confession can the State discharge this burden. *(People v. Dale, 20 Ill.2d 532.)* In an unbroken line of cases originating with *People v. Rogers, 303 Ill. 578,* this court has enforced this rule. *(People v. Sweeney, 304 Ill. 502; People v. Spranger, 314 Ill. 602; People v. Holick, 337 Ill. 333; People v. Cope, 345 Ill. 278; People v. Arendarczyk, 367 Ill. 534; People v. Ickes, 370 Ill. 486; People v. Kraus, 395 Ill. 233; People v. Davis, 399 Ill. 265; People v. LaCoco, 406 Ill. 303; People v. Gavurnik, 2 Ill.2d 190; People v. Wagoner, 8 Ill.2d 188; People v. Jennings, 11 Ill.2d 610; People v. Sammons, 17 Ill.2d 316; People v. Dale, 20 Ill.2d 532.)* The facts of these cases and the history of the rule were recently re-examined by the court in *People v. Sims, 21 Ill.2d 425,* and its continuing validity was reaffirmed."

There can be no doubt as to the materiality of the testimony of the officers whom the State failed to call as witnesses. "[T]he persons who must be called as witnesses or whose absence must be explained are those persons whose testimony would be material on the issue of the voluntary nature of the confession." *(People v. Sims (1961), 21 Ill.2d 425, 432.)* Detective Lenz conducted the interrogation which resulted in the defendant's initial oral confession. Officer Jackson was alleged to have beaten the defendant, and thus his testimony would be material whether or not he was present when a confession was actually made by the defendant. (See, *e.g., People v. Wright (1962), 24 Ill.2d 88, 93.)* When defense counsel claimed that other officers, and specifically Lieutenant Assirillo, were present at the arrest and interrogation of

the defendant, the prosecutor responded that he did not deny this but that "the State doesn't have to call every police officer involved."

The State failed to explain the absence of any of these officers. Detective Shine's statement that he could not contact Lenz did not justify the State's failure to produce Officer Lenz during the hearing. Similarly, Officer Johnson's statement that Officer Jackson "should be" on furlough did not even attempt to explain the State's failure to produce him. The State specifically refused to call Officer Assirillo as a witness or to explain his absence.

Because the prosecution failed to meet its burden of producing all witnesses material to the making of the statements or explaining their absence, defendant's statements to the police officers and the assistant State's Attorney should have been suppressed. and were improperly admitted in evidence. For that reason, the defendant's convictions must be reversed and the cause remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE UNDERWOOD, dissenting:

I cannot agree with the court's automatic application of the material witness rule to reverse this conviction. That rule provides that, when the voluntariness of a confession is questioned, the State must produce all material witnesses thereto or explain their absence. The absence of Officer Lenz was explained by the fact that he was on vacation and could not be reached. That explanation is, to me, sufficient in view of the further fact that it is nowhere contended that Officer Lenz in any way intimidated or coerced the defendant.

In my opinion we may properly notice the fact that the scheduling of vacations for members of metropolitan police forces is sufficiently complex that it would be virtually impossible, or at least highly impractical, to have every police officer connected with a case constantly available during the entire period in which that case is

478

either set for or on trial. We know from the records in the appeals to this court that substantial delays frequently occur between complaint and trial (approximately one year here), that cases are repeatedly continued after the initial trial setting, and that such continuances frequently occur on very short notice or with no advance notice at all. Those records also disclose that claims of police brutality, coercion and intimidation are routinely made by defendants in those cases in which confessions or admissions exist. That is not to say that such claims should be routinely dismissed, but it is to say that a rule which automatically reverses a conviction whenever a police officer, as to whom no claim of participation in coercive activity is made, is unavailable at trial is both an unnecessary and an undesirable rule.

The policy evidenced by the rule is, in my judgment, acceptable if treated simply as a general guideline to be applied in those situations where some reason is shown to exist warranting the belief that the testimony of the absent witness would be of substantial value in resolving the question of voluntariness. Such is not true here, and I cannot subscribe to what I consider to be, particularly as to Officer Lenz, an unwarranted application of a rule which seems to have become largely mechanical in its operation.