THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODNEY JOHNSON, Defendant-Appellant.

Fourth District   No. 4—87—0309

Opinion filed March 30, 1988.—Rehearing denied April 28, 1988.

Daniel D. Yuhas and David Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and armed robbery in violation of sections 9—1(a)(3) and 18—2 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(3), 18—2). The circuit court of Sangamon County sentenced defendant to a term of 20 years' imprisonment on the murder conviction. No sentence was imposed on the conviction for armed robbery.

Defendant and Michael Davis were both charged with the murder and armed robbery of John Snow. Both defendant and Davis gave statements to the police implicating the other. The trial was severed, and defendant was tried first. Defendant was convicted as an accomplice pursuant to section 5—2(c) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c)). On appeal, defendant alleges four errors: (1) defendant was not proved guilty beyond a reasonable doubt under the accountability theory; (2) the trial court failed to call all material witnesses to defendant's confession at a motion to suppress defendant's confession held during trial; (3) the prosecutor committed reversible error because of certain statements made in cross-examination of defendant and in closing argument; and (4) the armed robbery conviction is a lesser included offense of the felony-murder conviction, and must be vacated. In order to address defendant's reasonable doubt argument, a discussion of the pertinent evidence is required.

John Snow was found dead in the late morning hours of July 6, 1986. His body was lying near a stump in the backyard of 1403 East Reynolds Street in Springfield. Next to the house at 1403 East Reynolds is a tavern with a parking lot and alley. The yard at 1403 East Reynolds contained a large amount of trash and junk, including several bricks. Directly across the street from 1403 East Reynolds is the

Smooth Riders Motorcycle Club.

Dr. John Murphy, a pathologist, testified that an autopsy showed injuries to Snow's head and face. There were no wounds on the rest of the body. Snow's jaw was fractured in two places, and there was extensive hemorrhaging on both sides of the head. Snow's skull was fractured on the right side. Dr. Murphy gave his opinion that death was caused by a broad, blunt impact to the head. The doctor stated that bricks could cause such injuries.

Between July 6 and July 30, 1986, police had no substantial leads concerning Snow's death. Detective Daniel Hughes testified that he was assigned to the juvenile division of the Springfield police department, and that on July 30, 1986, he spoke to defendant at the police station in Springfield. The subject of the discussion was a matter unrelated to the John Snow death. In the course of the interview, defendant stated that he and Michael Davis had seen an acquaintance of theirs named Auggie Johnson kill a white man by hitting him in the head with a brick. Hughes notified the detectives who were investigating Snow's death and left defendant to talk to them. Defendant and Davis were allowed to go home after they talked to these detectives.

Detective Don Kolar testified that he was involved in the investigation of Snow's death. On July 30, Kolar talked with defendant and Davis. Both defendant and Davis gave similar statements, which were reduced in writing on the following day. Kolar read defendant's statement of July 31, 1986, into the record. The statement indicated that defendant was 16 years old. During the evening of July 5, 1986, defendant and Davis went to the Smooth Riders Club to play pool. The two went in the front door and saw Auggie Johnson and Larry Ingram playing pool at the back table. Defendant and Davis played pool at the front table.

A white man entered the clubhouse. Defendant described a man with similar features to Snow and dressed as Snow was on the night of July 5. The white man made a motion with his fingers and asked defendant if he knew where marijuana could be purchased. Defendant suspected that the man was a police officer. Auggie Johnson called the man to the second pool table, and then told him to stay where he was. The white man leaned against a pole while Auggie Johnson finished the pool game. Defendant and Davis finished their game, and Davis went outside. A little later, Auggie Johnson finished his game and walked out the front door with the white man. Defendant saw Auggie Johnson and the white man walk across the street and enter the alley by the tavern. Defendant went back inside the club and

bought some potato chips, and then asked someone to play a song on the jukebox.

Defendant stated that when he went back to the front door, he saw Auggie Johnson running in the alley. Auggie Johnson was carrying a large brown wallet in his left hand, and he ran down the alley toward his girlfriend's house. Defendant went outside and told Davis that it was time to go. Davis told him that Auggie Johnson had beaten the white man. Davis and defendant then left.

On the following day, Davis told defendant that Auggie Johnson had hit the white man in the head with a brick. On the same day, defendant heard his mother say that a man had been killed. A few days later, Davis heard Auggie Johnson tell Larry Ingram that Johnson had killed the white man. Auggie Johnson then looked at Davis and said, "You little niggers know what's good for you, you will forget about—forget what you have heard me talk about." Defendant agreed, and he and Davis left. This ended defendant's July 31 statement.

Kolar testified that the only differences between defendant's oral statement of July 30 and written statement of July 31 were that defendant added to the written statement that he could see currency sticking out of the wallet which Auggie Johnson carried, and that he could see the wallet because a mercury-vapor light was located nearby.

After obtaining statements from defendant and Davis, Kolar and another detective went to the Smooth Riders Club. They determined that it was impossible to see the backyard at 1403 East Reynolds from the porch of the Smooth Riders Club. On August 1, 1986, Kolar spoke with defendant again. After reading defendant his *Miranda* rights, Kolar said that it was physically impossible for defendant and Davis to have seen what they claimed. Defendant responded that he had seen Davis go up the alley behind Johnson and the white man, and then saw Davis run out of the alley ahead of Johnson. Defendant stated that other than this change, his prior statement was correct.

On August 7, 1986, Kolar again read defendant his rights and interrogated him. Kolar told defendant that Michael Davis had said that defendant had actually witnessed the beating. Defendant responded that after Davis followed Auggie Johnson and Snow, defendant had watched them until they were out of sight, and then returned to the Smooth Riders Club. He said that he later saw Davis and Auggie Johnson come out of the alley.

Kolar had investigated the area where Snow's body was found and had visited the Smooth Riders Club on July 6, 1986. Kolar later

realized that defendant's description of the interior of the clubhouse conflicted with his recollection of the interior. On July 5, 1986, the Smooth Riders Motorcycle Club had held a dance for its members. The dance began about 7 p.m. and lasted until approximately 2 a.m. For that event, the pool tables were pushed against the north wall for the dance. No one could have played pool during the dance. The juke-box was unplugged. The front entrance was bolted that night, and the club's patrons were forced to use the side entrance. Moreover, the club's president testified that Larry Ingram and Auggie Johnson were not at the club on the night of July 5, 1986, as they had been barred from coming to the club. The club's president stated he knew defendant and Michael Davis, but neither of them was at the clubhouse on July 5. The president did not recall seeing any white people at the clubhouse during the dance.

On August 15, Kolar reinterrogated defendant and said that defendant could not have been playing pool inside the clubhouse on July 5. Defendant insisted that his prior statements were true and denied Kolar's accusation that defendant had witnessed the beating. Kolar then confronted defendant with the fact that earlier in the day Davis had given a different statement. Defendant became agitated and asked if Davis had said that defendant had hit Snow in the head with a brick. Kolar responded by reading defendant a brief portion of Davis' statement, in which Davis had accused defendant of striking Snow with a brick. Defendant denied Davis' accusation and said that he would tell Kolar what had actually happened. Defendant said that he had not told the truth in his prior statements because he was covering up for Michael Davis. Defendant then gave a verbal statement, which was later reduced to writing.

The State moved to admit the statement into evidence. At this point, defense counsel objected to the August 15 statement because it had been made involuntarily, and was, therefore, inadmissible. After discussion, the trial court stated that counsel's objection would be treated as a motion to suppress. The motion was eventually denied.

Kolar then read defendant's August 15 statement into the record. The statement indicated that at about 2:45 a.m., defendant was standing at a phone booth at 14th Street and Reynolds. A white man walked up and asked if defendant had some pot. Defendant said no, and the man walked further down 14th Street toward Carpenter Street. The man stopped in front of the Smooth Riders Club and started talking to Michael Davis. The white man and Davis began walking towards the tavern, and defendant ran toward them, catching them as they crossed the street. The white man asked Davis whether

he had "good reefer," and Davis responded that he could get him some "good stuff." Davis also said that the police were watching him and that they would have to go where no one could see them. Davis and the white man walked up the alley, and defendant followed them. They walked to the backyard of 1403 East Reynolds. Davis told the man to give him the money, and the man said he wanted to see the marijuana. Davis then hit the man in the face with his fist, and the man fell to the ground. Davis picked up a red brick and began hitting the man in the face and head.

After striking the man three times, Davis threw the brick aside and kicked the man in the side. Davis went through the man's front pockets, removed the contents, and put them in his own pockets. Defendant could not see what Davis had taken. Davis rolled the man over. Defendant then approached Davis and the man lying on his stomach. Defendant took the man's wallet. Snow carried with him a large wallet, eight or nine inches long, which had a chain that attached to Snow's belt loop. Defendant removed the chain from the victim's belt loop and took the wallet. At the end of the alley, defendant started to go through the wallet. Davis came up and snatched the wallet from defendant. Davis and defendant ran behind the Springfield Housing Authority office, where Davis went through the wallet and gave defendant $30 or $35. Davis kept the wallet, and defendant proceeded home.

The only time defendant admitted any involvement was in his August 15 statement. Kolar admitted on cross-examination that there was no evidence to link either defendant or Michael Davis to the crime except their statements.

Defendant testified on his own behalf. Defendant discussed the statements he had given the police. On July 30, defendant and Michael Davis were questioned by juvenile officials in connection with the theft of tennis shoes. Defendant had just gotten out of the Department of Corrections and had been told that he would be taken to the detention center if he was picked up for any reason. He and Davis were afraid they would be sent to the Department of Corrections, so Davis told the detectives that they had information about Snow's death. Davis whispered to defendant to say that Auggie Johnson had killed Snow. Davis had offered to give the information in return for being allowed to go home. Defendant went along with Davis' story so that he could also go home.

Defendant was separated from Davis while defendant was questioned about Snow's death, but Davis had told defendant to say that Auggie Johnson and Larry Ingram were responsible, and defendant

made up the rest of his statement. Defendant stated he knew nothing about Snow's death, but he had heard many people blaming Auggie Johnson and Larry Ingram.

After giving the statement, Davis and defendant were released. On the following day, they were questioned again. Defendant stated he was told by police officers that he would be released if he gave them more information about Auggie Johnson. Defendant gave the same story, but the officer said that his statement could not be true and attempted to get him to admit being at the scene. Defendant refused to do so and continued to implicate Auggie Johnson and Larry Ingram. On August 15, officers told defendant that Davis blamed him for the murder and that his statements about Auggie Johnson could not be true. The officers insisted that Davis was responsible for the murder and wanted defendant to make a statement to that effect.

Defendant asked to see Davis' statement, and the officer replied that he usually did not show people statements of other witnesses but would let defendant read part of Davis' statement. After reading a little of the statement, defendant said that Davis was lying. The officer then read Davis' statement aloud. In his statement, Davis had blamed defendant for the offense. Defendant then gave a statement implicating Davis because he could see no other way out of his situation.

Defendant testified that his statement of August 15 was a fabrication. He denied going to the Smooth Riders Club on July 5. Defendant stated that he saw Michael Davis for about 10 minutes that night while both were at a party. He did not see Davis again that night. Defendant denied seeing Snow at any time. Defendant stated he was able to give details of the crime because of pictures the police had shown him, and because of rumors circulating in the community.

■ Section 5—2(c) of the Code provides the statutory ground for accomplice liability. In relevant part, that section provides:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).)

Our courts have interpreted this statute to consist of three elements: (1) a defendant solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; (2) this

participation on the defendant's part must have taken place either before or during the commission of the offense; and (3) the participation must have been with the concurrent, specific intent to promote or facilitate the commission of the offense. *People v. Ramirez* (1968), 93 Ill. App. 2d 404, 410, 236 N.E.2d 284, 288; *People v. Young* (1983), 116 Ill. App. 3d 984, 994, 452 N.E.2d 718, 724.

■ In the instant case, defendant was convicted as an accomplice of armed robbery and felony murder. The felony-murder conviction was predicated on the armed robbery offense and is justified if defendant's participation in the armed robbery has been proved.

> "When two persons have a common design to accomplish an unlawful purpose, the act of one is the act of all and all are equally guilty of whatever crime is committed. [Citation.] Proof of the common purpose need not be supported by words of agreement or direct evidence but can be drawn from circumstances surrounding the commission of an act by a group." (*People v. Cawley* (1979), 77 Ill. App. 3d 780, 784, 396 N.E.2d 865, 868.)

Our inquiry, therefore, focuses on defendant's participation in the armed robbery.

■ Defendant argues the evidence was insufficient to convict him as an accomplice. Defendant contends there was no evidence that defendant aided Davis before or during the commission of the crime or that defendant intended to assist Davis in robbing Snow. Defendant states that the only evidence of his participation was from the August 15 statement where defendant admitted taking Snow's wallet. The wallet was taken after Davis had assaulted Snow and had rummaged through the pockets of the mortally wounded man. It is defendant's contention that the armed robbery had ceased by the time defendant approached and took Snow's wallet. Defendant suggests that he may have committed a robbery on his own, but that it cannot be inferred defendant aided or intended to aid Davis in committing the armed robbery. We reject defendant's analysis.

In his August 15 statement, defendant admitted being in the presence of Davis and Snow. Defendant watched the assault and then participated in the robbery by taking Snow's wallet. He unhooked the chain from Snow's belt. Davis and defendant then retreated to a safe place to divide the proceeds. These facts are all evidence of defendant's participation during the commission of the crime, as well as evidence of an intention to commit the crime. Although defendant did not admit striking the blow that killed Snow, this does not free him from accountability.

"Although mere presence at the scene of an offense or mere acquiescence in another's actions is ordinarily insufficient to establish accountability, one may be held to aid and abet without physically participating in the overt act. [Citation.] *** Although accountability requires that the assistance of the person to be held accountable must occur prior to or during the commission of the crime, such assistance can be inferred from conduct which occurs after the event." (*People v. Young* (1983), 116 Ill. App. 3d 984, 994, 452 N.E.2d 718, 724.)

Defendant's presence during commission of a crime without disapproving or opposing the commission of the crime, a continued close affiliation with the codefendant after the commission of the crime, and his failure to report the incident or confide in anyone about it are all factors which may be considered in establishing accountability. (*People v. Watson* (1982), 106 Ill. App. 3d 315, 317, 436 N.E.2d 7, 8; *People v. Lopez* (1979), 72 Ill. App. 3d 713, 716, 391 N.E.2d 105, 108.) Defendant admitted an involvement greater in degree than merely being present. He participated in the crime when he took Snow's wallet. Defendant's statement of August 15 provided the jury with sufficient grounds to find defendant guilty beyond a reasonable doubt of felony murder and armed robbery.

■ Defendant's second allegation of error relates to a motion to suppress held during Detective Kolar's testimony at trial. Detective Kolar testified on the second day of trial. In his testimony, Kolar described several meetings with defendant, culminating in defendant's statement of August 15. Kolar stated that two other officers were present during the interview on August 15. The assistant State's Attorney moved to introduce the statement into evidence. Defense counsel objected based on the voluntariness of the statement. The trial court determined the objection would be treated as a motion to suppress. Defense counsel then cross-examined Kolar out of the presence of the jury. Following cross-examination, the court asked counsel if he had further evidence on the motion. Counsel replied that he did not. The court denied the motion.

Defendant argues the conviction should be reversed and the cause remanded for a new trial because the State failed to call all material witnesses, namely, the two other officers who were present on August 15. In a motion to suppress, at which voluntariness of a confession is challenged, the State must produce all material witnesses connected with the taking of the statement or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, 282 N.E.2d 712, 715.) However, section 114—11 of the Code of Criminal Procedure of 1963 (Ill.

Rev. Stat. 1985, ch. 38, par. 114—11) provides that any objection to the failure to call all material witnesses must be made to the trial court. Defense counsel never raised the matter of questioning the other officers either during his cross-examination or in his post-trial motion. The issue is, therefore, waived. Moreover, counsel's cross-examination revealed no merit to the objection such that we should apply the plain error rule.

■ Next, defendant alleges the prosecutor made prejudicial statements while cross-examining defendant and in the prosecutor's closing argument. The assistant State's Attorney cross-examined defendant regarding the various statements defendant gave to police. Defendant referred to Michael Davis as the one who initially suggested giving information to the police in exchange for being released from police custody. Defendant also said Michael Davis told defendant to say that Auggie Johnson and Larry Ingram committed the crime. However, defendant stated he made up the details contained in the statements. During this cross-examination, the following colloquy occurred:

"Q. And you told the police that you had been to the Smooth Riders Motorcycle Club, right?

A. Right.

Q. Now, are you telling us that you were never there on that night?

A. Right, that's what I'm telling you.

Q. But you told the police you were there with Michael?

A. Right.

Q. And you're making all this up on the 30th of July?

A. Right.

Q. Would you say it's coincidental if the same detail came from Mike Davis?"

At this point, defense counsel objected. The court overruled the objection. The State's Attorney rephrased the question to eliminate reference to the Michael Davis statements. Defendant argues the prosecutor attempted to comment on evidence not in the record. However, we find no reversible error in the remark. As the State points out, Michael Davis had been the subject of discussion for much of the defendant's trial. The jury was well aware of Davis' statements although they were never admitted into evidence. The remark by the assistant State's Attorney may have been inappropriate, but under the circumstances, it was not prejudicial error.

Similarly, we have reviewed the record regarding the prosecutor's closing argument, and we find no prejudicial error.

■ Finally, defendant argues the conviction for armed robbery

should be vacated as it is an included offense of the felony-murder conviction. The underlying felony of the felony-murder conviction was armed robbery. The State concedes this point, as well it should. We, therefore, modify the judgment imposed against defendant by vacating the conviction for armed robbery. This does not affect defendant's sentence as the trial court sentenced defendant only on the murder conviction.

For the foregoing reasons, the order of the circuit court of Sangamon County is affirmed as modified.

Affirmed as modified.

GREEN, P.J., and SPITZ, J., concur.