(No. 32257.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WESLEY SLOSS, Plaintiff in Error.

*Opinion filed March 20, 1952.*

FRANCIS T. McCURRIE, ROBERT E. HARRINGTON, and JOHN M. BRANION, all of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and WILLIAM J. McGAH, JR., all of Chicago, of counsel,) for the People.

Per CURIAM: The defendant, Wesley Sloss, was indicted in the criminal court of Cook County for the murder of Bessie Gates. He pleaded not guilty. A jury found him guilty and fixed his punishment at death. Motions for a new trial and in arrest of judgment were overruled. Defendant's petition for a writ of error has been granted and the writ of error made a *supersedeas*. The record is now before us for review.

Between 11:30 P.M. on January 30, 1950, and 12:30 A.M. on January 31, two police officers, Lucian Suprnant and Adolph Kolinski, in response to a radio call, went to 2349 West Fulton Street, in Chicago, where a woman, subsequently identified as Bessie Gates, and described by defendant as his common-law wife, was found lying on the top step leading to the front porch in a pool of blood. Unconscious and bleeding, she was taken to the county hospital where she died on January 31, without having regained consciousness. So far as the record discloses, there were no witnesses to the fatal assault.

Dr. James J. Kearns, coroner's physician, who performed an autopsy on the same day, testified that the body was that of a woman thirty-seven years of age, five feet, three inches tall, weighing about 125 pounds, and that there were four deep cuts in the back of her head on the left side and a fifth cut on the top of the head. Dr. Kearns ex-

pressed the opinion that the cause of death was skull fracture and cerebral laceration caused by a sharp instrument.

Defendant, when arrested in February, 1950, and questioned about the assault and killing of Bessie Gates, disclaimed any knowledge of the homicide. On January 13, 1951, immediately following his release from the House of Correction where he had been confined about ten months, he was taken into custody by police officers Cornelius Carr and Harry A. Smith. He was taken to the police building at 1121 South State Street and from there to the Crime Laboratory where he was given two lie-detector tests. He was then taken downstairs and left alone until the following day.

On January 14, defendant made a confession which was typewritten and signed by him. Those noted on the statement as present were Sergeant James McMahon, detective bureau, Carr, and patrolman Marshall Carroll, detective bureau, typist. On January 15, defendant made and signed another confession described as the re-enactment statement. Listed as present were John Cogan, assistant State's Attorney, Captain Jerome Looney, Twenty-seventh District, Sergeant McMahon, officers Carr and Robert Noonan, homicide detail, detective bureau, H. E. Martin, H. M. Tobias, and H. E. Erickson, the reporter. Defendant's objections to the introduction of these confessions in evidence were overruled. Without the confessions there is little, if any, evidence connecting defendant with the murder of Bessie Gates. Defendant challenges their admission upon the grounds that they were extorted by violence, brutality, and unlawful confinement; that all the witnesses to the procuring and execution of the confessions were not produced upon the preliminary hearing as to their admissibility, and that the duress and force employed to obtain the first confession continued to exist and influenced the making of the second statement. We review the evidence adduced upon the hearing before the trial judge to determine the admissibility of the confessions in evidence.

Defendant testified that, on January 14, he was taken to the fourth floor of the building at 1121 South State Street where Carr, Smith and two other officers whose names he did not recall were present; that the four men were in and out of the room at the time of the alleged beating and that altogether five were present at different times; that he did not know them but would recognize them if he saw them again; that after all present had interrogated him repeatedly, a hose two inches in diameter and about thirty-six inches long was produced; that he took off his coat and removed his shoes, as directed; that an attempt to handcuff him behind a chair was unsuccessful because his arms were too short; that, in the course of the attempt, he was struck four or five times and his head pushed down by an officer's foot; that thereupon, they handcuffed his hands behind him, sat him in a chair, struck him and got the hose, and that they cursed him, one saying, "You God damned nigger, I am going to kill you. You'd better start talking and don't quit. Do you want to take it the easy way or are we going to murder you?" Defendant stated that he replied he would never confess to something he had not done and knew nothing about; that Carroll struck him on the head, shoulders and leg with the rubber hose; that they all beat him over the head with the hose; that officer Carr's partner, Smith, beat him in the stomach with his fist "altogether I would say one hundred times;" that he fell down on the floor several times, would move around, and that all four of the officers then kicked and beat him in the back between fifteen and twenty times; that a rib was broken when an officer whom he identified as Smith stood on his stomach; that to his complaint to the officer standing on his rib that he was killing him, the officer replied, "That is what I am going to do;" that he was whipped and hit on the neck with the hose several times, and that Smith booted him with his foot after he was down. He also stated that he "had a bad leg

* * * in two places [because of] gangrene;" that, although he so informed them, they continued to strike him on the bad leg, and that he reached the point where he could not stand any more and said, "I will sign anything you want me to sign because you are killing me." Defendant testified that at this juncture Carr came in and made the others stop hitting him; that he was carried into the next room where the questions contained in the first confession were propounded, and that he answered them because he had been beaten and was being beaten to death. Defendant asserted that, prior to the beating, none of his ribs were broken and that afterwards he had broken ribs.

After the statement was signed, defendant said he was taken to the eleventh floor where prisoners were kept and placed in the first cell; that he could not walk and was left on the floor of the cell; that he was later taken to another cell where he stayed all night on the floor; that the prison doctor came the next morning at which time officer Carr and assistant State's Attorney John Cogan were present; that he was unable to reply to the doctor's inquiry as to where he was hurt; that the doctor taped and bandaged his side and, after he had denied he was a dope addict, gave him a "good size capsule;" that he was then carried back and placed in the cell where he was again visited by Cogan, and that although he refused at first because he was too sick, he finally agreed to go "west to see the State's Attorney" because he felt the air might do him good.

Defendant testified that he was then taken to the Warren Avenue police station and from there a group, consisting of himself, Cogan, officers Carr and Smith and an unidentified officer, and two newspaper reporters, went to 241 Artesian Avenue where he told them that he had obtained the ice pick which he used to kill Bessie Gates; that he had a conversation with one Johnnie Jones there in which he told Jones that he did not kill Bessie Gates but

that he had to do something to save his own life; that, from 241 Artesian Avenue, the group went to 2349 Fulton Street; that in the interrogation which took about twenty minutes, Cogan asked the questions, and that they then returned to Eleventh and State Streets where he signed the re-enactment statement.

On the next day, January 16, defendant stated that he was taken to the felony court, bound over by the grand jury, and then returned to the county jail. He further testified that because of his condition he was removed two days later to the jail hospital where he remained until February 5; that while there Doctor Crane examined him, and that he was under hospital care until March 18.

The evidence adduced by the various medical witnesses will be summarized. Dr. Louis Rose testified that he examined defendant about 8:55 A.M. on January 15, 1951, at the police building; that defendant stated that his side had been hurt; that because of the tenderness he could not find any fractures upon physical examination, and that he taped his chest and gave him a sedative to relieve the pain. He testified, further, that he asked defendant the cause of injury and that the latter mumbled something which he could not understand. Dr. Robert D. Crane recalled having treated defendant in January, 1951. He testified that his examination revealed a fracture of the eighth rib, and that he strapped his right chest and gave him a sedative to relieve his pain. He added that defendant told him he had received the injury at the police station. According to Dr. Crane, defendant was hospitalized from a week to ten days. Dr. Andrew J. Toman, associated with the hospital at the House of Correction, and nurse Anna Canonico both testified that the records of that institution showed no treatment given to, or injury befalling, defendant while there.

Officer Carr testified that he did not see anyone strike defendant at any time and, in particular, that he did not

see his partner, officer Smith, push him in the face. According to Carr, but two officers were in the room when defendant made his first statement. He further stated that, although defendant did not complain about being sore or that he was injured on January 14, he did tell him the next day, January 15, that a doctor had attended him in the lockup and that he had an injury in the chest, and that, to his inquiry, defendant explained that when he was brought to his cell a prisoner struck and knocked him down, and was kicking him on the floor when two other prisoners came to his rescue. This version of the origin of defendant's injuries, according to Carr, was given in the presence of officer Smith.

Officers McMahon and Carroll not only denied striking defendant but stated that they did not see anyone else do so at the interrogation on January 14. Officer McMahon added that he was present at the re-enactment on January 15 and at that time defendant was able to walk.

Officer Smith testified that he did not personally question defendant on January 14 and was not present during the interrogation which resulted in the first confession; that he merely passed by the door of the room and, at that time, had observed officer Carr alone with the defendant, and that, accordingly, he had neither committed nor witnessed the acts of brutality attributed by defendant to him and his named associates. Officer Carroll corroborated Smith in testifying that he did not see the latter while he was occupied taking the statement. Smith further stated that although he was not present during the re-enactment, he was with defendant on the way to the west side; that en route the latter complained he was hurt; that to Smith's inquiry, he explained, "Well, I was unfortunate to be in the lockup with a couple of fellows I had a little difficulty with in the past," and that several of them beat him up.

A fair summary of the two confessions is that defendant had lived with Bessie Gates as his common-law wife

for about a year and a half in 1945 and 1946; that she lived at 2349 West Fulton Street, in Chicago; that he had not seen her for about three weeks when he met her in a tavern about 9:30 P.M. on January 30, 1950; that a friendly conversation ensued and that he, Bessie Gates and Robert Boyd, commonly called "Snuff," departed together; that they went to 220 North Western Avenue for a short time and then separated, defendant going to his home at 241 North Artesian Avenue where he went to bed; that he awakened about 11:00 o'clock, dressed, took an ice pick from a shelf in the kitchen, placed it in his overcoat pocket and returned to the Western Avenue address last stated; that, as he approached, he saw Bessie Gates walking north on the east side of Western Avenue; that he called to her and when she did not respond but continued walking, he followed her; that she went to the nearby house of a woman named Fannie; that he waited for her on the back porch until she reappeared and then asked her for some money because he was broke; that when she refused, he called her a liar and struck her; that she struck him and that he, in turn, slapped her on the face, seized her by the neck, held her and stabbed her in the left side of her head with the ice pick about three times, and that he then walked to an alley south of Fulton Street, a short distance away, where he threw the ice pick in an ash heap or rubbish heap, and returned to his home and went to bed. On January 31, defendant went from Chicago to Gary, Indiana, and from there to Dayton, Ohio, arriving on February 1 and remaining until February 6, when he went to the Dayton police department and announced that he was wanted for "jumping a bond in Chicago" and, also, that he might be wanted for questioning in connection with the murder of Bessie Gates.

From defendant's testimony at the preliminary hearing on the admissibility of the statements taken on January 14 and 15, it is clear that, on January 15, while en route to

the re-enactment, he complained to officer Carr that he suffered an injury; that he told assistant State's Attorney Cogan he was signing the re-enactment statement for the reason he had been beaten up by the police, saying, "I will sign these for you but you know I was forced to do so, I was beaten up. * * * It was under duress. My ribs were broken and I will sign it, it doesn't matter." Cogan did not testify upon the trial to deny or explain the statements defendant claims he made in Cogan's presence.

The written confession taken by the police officers on January 14, if defendant's version be accepted, was the result of revolting coercion and was involuntary. Conversely, according to officer Carr and others, the confession was voluntary. Although the three persons named in the confession as present when it was made testified upon the preliminary hearing, defendant testified that four or five officers were present throughout the questioning and during the time he was being beaten. He did not recall the names of all the officers but said that he could identify them if they were brought in, and did identify officer Smith as having been one of the officers who had beaten him up on January 14. A different situation obtains with respect to the second confession or the so-called re-enactment statement made shortly after the first confession. Neither assistant State's Attorney Cogan, who supervised the re-enactment and did the questioning, nor officers Looney and Noonan and the other two witnesses to the statement, H. E. Marten and H. M. Tobias, were called by the prosecution to testify at the hearing upon the admissibility of the re-enactment statement.

Confessions are competent evidence only when voluntarily made. (*People* v. *Weber,* 401 Ill. 584.) In determining, at a preliminary hearing, whether a confession was made voluntarily or as the result of fear, the burden of proof rests upon the prosecution. (*People* v. *Davis,* 399 Ill. 265.) A prisoner is deprived of due process of law

by use of a confession of guilt obtained from him by force, violence, brutality, incessant questioning, the "sweating process," or any other of the methods commonly known as the third degree. (*People* v. *Thomlison,* 400 Ill. 555; *People* v. *Rogers,* 303 Ill. 578.) A confession unlawfully obtained renders one made later, while under the same constraint, although apparently voluntary, inadmissible. (*People* v. *Sweetin,* 325 Ill. 245.) The effect of abuse, brutality, constant and continued interrogation, or third-degree methods in obtaining a confession affect the later one when made in the same place of confinement. (*People* v. *Thomlison,* 400 Ill. 555; *People* v. *Santucci,* 374 Ill. 395.) "It is the duty of the trial judge in every case when he has reason to suspect that a confession has been extorted from the defendant, to absolutely refuse to permit any evidence as to the confession until the State has examined every police officer and everyone present at such examination, so that the full truth may be disclosed; * * *." (*People* v. *Rogers,* 303 Ill. 578, 590; see, also, *People* v. *Thomlison,* 400 Ill. 555; *People* v. *Davis,* 399 Ill. 265; *People* v. *Holick,* 337 Ill. 333.) Again, all facts surrounding the obtaining of a confession may be shown to determine whether it is voluntary or otherwise. *People* v. *Thomlison,* 400 Ill. 555; *People* v. *Crabb,* 372 Ill. 347.

Defendant's testimony upon the preliminary hearing before the trial judge as to the admissibility of the confessions in evidence, standing alone, discloses that he was beaten by police officers and that at least one rib was broken during the process of coercing the first confession. Competent medical testimony confirms defendant's testimony that one of his ribs was fractured on January 14, 1951, and that his condition thereafter was such as to require hospitalization. To rebut defendant's testimony and evidence as to his physical condition, clear and convincing proof was required that this condition was not produced by the actions of the police officers who were present when

the first confession was made and, further, that his condition in no way affected the obtaining of the second confession or re-enactment statement. The facts and circumstances concerning an alleged voluntary confession given to police officers by a defendant while under arrest should be carefully scrutinized, and the trial court should not deem itself bound by the testimony of the police officers alone, without taking into consideration all of the surrounding circumstances. (*People* v. *Thomlison,* 400 Ill. 555.) Subjecting the instant case to this searching scrutiny, one aspect stands out to such an extent as to render further discussion of the admissibility of the confessions unnecessary.

An inescapable duty rested upon the prosecution in the present case to bring in every police officer and every other person connected with taking the statements in order to ascertain whether they were forced by threats and physical violence. With respect to the confession taken on January 14, defendant testified that from four to five officers were present at the time he claims to have been beaten. Of these, the three named as witnesses to the confession testified, denying categorically defendant's version. A fourth, identified as officer Smith, testified that he was not present in the room where the confession was made, and merely passed by in the corridor at one time. While the testimony of the various officers as to who was present is not wholly satisfactory and, to that extent, supports defendant's assertion concerning the presence of a fifth officer, it is unnecessary to bottom our discussion on this point. Upon the record before us, it is undisputed that defendant made complaint to the lockup keeper and to assistant State's Attorney Cogan; that the latter saw a physician examining him on January 15; that Cogan was in charge of the re-enactment on January 15 and conducted the questioning of defendant, and that, just prior to the questioning, defendant protested to Cogan concerning the duress applied to him. Cogan was not produced as a witness. Further,

officers Looney and Noonan, who were present when the re-enactment statement was made, did not testify at the hearing upon the question of its admissibility and no explanation was given for the failure of the prosecution to produce them as witnesses. Nor were H. E. Marten and H. M. Tobias, also listed as present at the re-enactment on January 15, called to testify in denial of defendant's account of the re-enactment. The significance of the absence of the five last-named persons is heightened in view of defendant's assertion as to his patently weakened condition. Further, during the re-enactment in which defendant at all times must have been in close proximity to either Cogan or some attendant officer, defendant asserts that he informed Johnnie Jones that he had confessed in order to save his own life. Defendant's testimony with respect to his protest to Jones should have been rebutted by the prosecution either by negativing Jones's presence during a portion of the re-enactment or producing him as a witness. Under the circumstances, it cannot be denied that there has been a flagrant violation of the salutary rule that, in cases such as the instant one, *all* those connected with the confession in question should testify.

The re-enactment statement followed so closely and was so directly related to the first confession that it cannot be deemed voluntary unless the initial confession was itself voluntary. The jury could well have been impressed to the point of persuasion that the re-enactment statement was voluntarily made and, in sole reliance upon it, returned the verdict of guilty. We simply cannot tell from the evidence or from the documents themselves upon which statement the jury relied in reaching its verdict and, since the second statement was not proved to have been voluntarily made, it should not have been admitted in evidence. Upon the next trial every police officer and other persons present at the time the confessions were made should be produced as witnesses to testify to the character of the confessions.

Defendant next contends that since the *corpus delicti* cannot be proved by the confession of a defendant alone, it has not been established here beyond a reasonable doubt. The *corpus delicti* in a murder case consists of two elements—the fact of death and that the death was produced by the criminal agency of some person. (*People* v. *Manske,* 399 Ill. 176.) In view of the testimony of Dr. Kearns, who performed the autopsy, and the police officers who found the body, there can be no doubt that the *corpus delicti* was properly and adequately established. Defendant's actual contention would seem to be that the facts as brought out by the confessions were not sufficient to connect him with the criminal agency proved in the *corpus delicti*. This is based primarily upon the following portion of the record, developed during the direct examination of Dr. Kearns by the prosecution:

"Q. Could you determine from the medical examination what type of instrument would have caused such wounds? [Objection.]

"A. It must have been a sharp instrument to have cut the skull in four different places. The skull fractures were localized in the left area.

"Q. In the area where the sharp-pointed instrument marks were, is that correct?

"A. That is correct.

"Mr. Branion [defense counsel]: I object to the sharp-pointed, the Doctor did not say it must have been a sharp-pointed instrument, he said it must have been a sharp instrument. Those are his words.

"The Court: Did you say sharp-pointed, Doctor?

"A. A sharp instrument."

Defendant argues that, by the quoted exchange, Dr. Kearns eliminated or excluded the meaning, "pointed," when he said "sharp." We do not agree. While it is true that all confusion could have been easily avoided by just a slightly more thorough examination, the doctor's response

to the trial judge's inquiry merely reiterates, as he was required to do, what he had stated previously, and cannot properly be regarded as positive testimony negating the idea of a sharp-pointed instrument being the murder weapon. The doctor's utilization of "sharp" in the first instance is perfectly compatible with the type of weapon established by the confessions. Thus, the word "sharp" is defined in Webster's New International Dictionary, 2d ed., as "Having a very thin edge or fine point;" and the first synonym listed under the definition is "pointed." Finally, from the record before us, we cannot hold that the nature of the wounds, as described by Doctor Kearns, is such as would render them impossible to have been inflicted by the variety of weapon allegedly used by the defendant.

Complaint is made that an assistant State's Attorney, in his closing argument to the jury, made three prejudicial and inflammatory statements against the defendant. The record discloses that no objection was interposed to the second statement now assailed and its propriety is, accordingly, not open to review. (*People* v. *Holt,* 398 Ill. 606.) It suffices to say that the other two challenged statements were within the scope of legitimate argument.

The final contention requiring consideration is that the trial court erred in refusing to give the following instruction on behalf of defendant: "The court instructs the jury that questions were asked you as you were being qualified, whether the fact that the evidence might indicate that the defendant had heretofore been convicted of murder would influence you in arriving at your verdict. However, no such evidence has been introduced in this case so you are to totally disregard those questions and not let them have any bearing on your verdict in this case." Defendant asserts that refusal of this instruction left before the jurors the impression of something which they should have been directed to disregard. Defendant did not testify in his own behalf. This being so, proof could not have been

made of a prior conviction of murder. Even though the jury was properly instructed to confine its consideration to the evidence in the case and to not be influenced by anything other than the law and the evidence, we are of the opinion that the ends of justice would have been better served by giving the instruction.

The judgment of the criminal court of Cook County is reversed and the cause remanded for a new trial.

*Reversed and remanded.*