THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BARBARA BROOKS, Defendant-Appellant.

First District (5th Division)   No. 83—1635

Opinion filed November 22, 1985.

Hal Ross Kessler and Mitchell C. Ex, both of Kessler & Ex, of Chicago,
for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat,
David A. Cuomo, and Mary Ann Callahan, Assistant State's Attorneys, of
counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:
Following a bench trial, defendant Barbara Brooks was convicted
of involuntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a)),
and was sentenced to five years' imprisonment. On appeal, defendant
contends that her statement should have been suppressed because the
State failed to produce two material witnesses; that the trial court

erred in permitting the State to introduce evidence of collateral offenses; that the trial court deprived her of the assistance of counsel by sequestering her before cross-examination; and that the State failed to prove her guilt beyond a reasonable doubt. Facts pertinent to our disposition follow.

On June 22, 1982, defendant Barbara Brooks and her husband were charged with the murder of their four-year-old son, Solomon. According to the medical examiner, the child died of hypernatremic dehydration and multiple blunt trauma to the head; the attending physician and a pediatric neurologist attributed the death solely to hypernatremic dehydration. The State's theory was that defendant and her husband punished young Solomon by beating him and forcing him to drink a salt water solution. Defendant's statement was the only evidence which connected her to the apparent cause of death. Defendant moved to suppress her statement prior to trial.

At the suppression hearing, defendant testified that she and her husband, along with their seven children, went to the local police station at about noon on June 22, 1982. She said that she was still mourning her son's death: she had neither slept nor eaten since her son had fallen ill three days earlier. She described her mental state as "a total wreck," "out of it" and "devastated." When they arrived at the station, she and her husband were placed in separate interview rooms, and the children stayed in a hallway.

Defendant testified that after about an hour, Detectives Dwyer and McNally entered the room. Dwyer approached her, slammed his hand down on a telephone directory, propelled it across the room and accused her of murdering her son. She denied it, but they said she was lying and left. The detectives returned 20 minutes later, and Dwyer said that defendant's husband had told them about her beating young Solomon with a souvenir baseball bat. Dwyer also said that they were bringing down "papers" on child abuse.

Later, according to defendant, Detectives Dwyer and McNally came back with two youth officers, whose names she did not know. The "stout" youth officer told her that if she did not confess, they would take her kids away, and she would never see them again. Defendant denied that she killed her son, and begged them not to take her kids away. The stout youth officer said to his partner, "She's lying," and then, "We're getting ready to take them now." All of the officers left, then a few minutes later, Dwyer returned. Defendant testified that Dwyer seemed friendly and apologized for the "Starsky and Hutch" treatment. He explained to her that they figured she was lying, but if she admitted that she might have hit the boy, then she

could take her children home. Defendant recalled that Dwyer first admonished her of her rights during this conversation.

A short while later, Assistant State's Attorney Edwards came in alone and introduced himself. Defendant testified that she said to Edwards, "They told me if I didn't say I may have hit my child with a bat, they were going to take them away." She stated that Edwards said, "What?" and then Dwyer and the youth officers entered the room. She said that she dropped the subject because she did not want trouble. Edwards read her rights to her, and she gave a statement.

A few minutes later, Edwards said that the shift was changing, introduced defendant to Assistant State's Attorney Frost, and left. Defendant answered Frost's questions, then repeated her answers in the presence of a court reporter. On cross-examination, she admitted that she signed the transcribed statement, but explained that she signed it in order to get her children back.

The State called four witnesses. Detective Robert Dwyer testified that he interviewed defendant, her husband and the children soon after they arrived at the station. He denied throwing a phone book and denied accusing defendant of murder. After speaking with the medical examiner, Dwyer phoned the felony review section of the State's Attorney's Office for assistance. Dwyer discussed the case with Edwards some time after 4 that afternoon, then Edwards had a conversation with the medical examiner. Edwards indicated to Dwyer that the investigation would be somewhat involved, and that the assistant assigned to the upcoming shift should take the case.

Dwyer interviewed defendant a second time between 4:30 and 5:30 p.m. He read her rights to her, and she indicated that she understood. According to Dwyer, McNally and two youth officers were present throughout the interview. Dwyer stated that the youth officers did not threaten to take the children, and no one told her what to say. Edwards entered the room toward the end of the interview and told Dwyer that another assistant would take the case.

Detective Raymond McNally testified that he, Dwyer and defendant were present for the first interview. Dwyer did not strike any phone book, and he did not accuse defendant of murdering her son. McNally stated that the youth officers never threatened to take defendant's children away. According to McNally, Edwards spoke to defendant, but not alone.

Assistant State's Attorney William Frost testified that he began his felony review shift at 6:30 p.m. on June 22, 1982. Frost interviewed defendant for about 15 minutes with Edwards and Dwyer present. Afterwards, Frost asked defendant if she would make a

statement in the presence of a court reporter. Defendant, Dwyer, Frost and the court reporter were present for the final statement. Frost stated that defendant was calm, that she never indicated she was tired or hungry, and that she never said she was told what to say. On cross-examination, Frost admitted that he did not ask if she had been told what to say, nor did he ask whether she was threatened or coerced. Frost said that he discussed an earlier statement with Edwards.

Youth Officer Charles Holz testified that on June 22, 1982, his partner was John Abran. Holz stated that he was about 20 pounds heavier than his partner, and that his partner had recently been involved in a traffic accident and was in the South Chicago Hospital. Holz said that he and his partner were present for an interview of the defendant, but they were in and out of the room. Holz denied saying that he would take defendant's children away; he said that Dwyer did all of the talking. On cross-examination, he admitted that he had conversed with defendant in order to fill out a form concerning the children. Holz recalled that Edwards entered the room while defendant was there, but he did not know who else was in the room, and he could not recall how long Edwards stayed there.

Defense counsel argued that the State failed to produce Assistant State's Attorney Edwards and Youth Officer Abran. Defense counsel argued further that defendant's statement was not voluntary in view of her weakened physical and emotional state and the threat to remove her children. The assistant State's Attorney responded that Edwards was not present when any of the alleged misconduct occurred, and that Abran's absence was excused. The prosecutor also argued that the State was not at fault for defendant's weakened condition, and no threat was ever made. The trial court denied the motion to suppress, ruling that Edwards and Abran were not material witnesses and that the statement was voluntary.

Defendant and her husband waived a jury and were tried together. At the close of the State's evidence, the trial court directed a verdict in favor of the husband. After trial, the judge found defendant guilty of involuntary manslaughter and sentenced her to five years' imprisonment. Defendant filed a timely notice of appeal.

OPINION

■ Confessions are not favored in the courts of this country, because "a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence in-

dependently secured through skillful investigation." (*Escobedo v. Illinois* (1964), 378 U.S. 478, 488-89, 12 L. Ed. 2d 977, 985, 84 S. Ct. 1758, 1764.) Accordingly, the State bears a heavy burden of showing that a confession was knowingly, intelligently and voluntarily made. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628; *People v. Kincaid* (1981), 87 Ill. 2d 107, 116, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) The trial court's decision concerning voluntariness "depends not on any one factor, but upon the totality of all the relevant circumstances." (*People v. Johnson* (1970), 44 Ill. 2d 463, 468, 256 N.E.2d 343, *cert. denied* (1970), 400 U.S. 958, 27 L. Ed. 2d 266, 91 S. Ct. 356.) In order to assure that the decision will be based on a careful scrutiny of all of the facts, our supreme court has held again and again that the State must produce all material witnesses to a confession or explain their absence. See *People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712, and cases cited therein.

■ Defendant contends that her statement should have been suppressed because the State failed to produce two material witnesses, Assistant State's Attorney Edwards and Youth Officer Abran. The State argues that neither Edwards nor Abran was a material witness. The State maintains that Edwards did nothing more than turn the case over to Frost, and that Abran was present for only a small fraction of the interview. We reject the State's argument and find that both Edwards and Abran were material witnesses.

Defendant raised two issues of voluntariness concerning which Edwards and Abran had relevant knowledge: that she was in a weakened physical and emotional condition as a result of her son's illness and death, and that a youth officer threatened her with the removal of her children if she did not change her story. The physical, mental and emotional condition of the accused is an important consideration in evaluating voluntariness (see, *e.g.,* *Spano v. New York* (1959), 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202), and a comparable threat has been held coercive (see *Lynumn v. Illinois* (1963), 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917). Edwards and Abran personally observed defendant during one or more of the interviews, and so they could say whether or not she appeared fatigued, strained or agitated. More important, Abran was present when Holz threatened her, and she made a contemporaneous complaint to Edwards. Edwards and Abran might admit defendant's allegations or deny them, but the materiality of their testimony is apparent.

The State's assertion to the contrary is unpersuasive. The State argues that Edwards' only connection to the statements was his mo-

mentary observation of defendant when he turned the case over to Frost. However, defendant claimed that Edwards took a statement from her, and her testimony in this respect is corroborated by Frost and McNally. The State argues that Abran was present for only a short while, but overlooks defendant's allegation that she was threatened during precisely that short while. The State suggests that we should rely on Holz' denial, but ignores the impeachment of Holz on cross-examination. In short, the State's position is that defendant lied and Dwyer told the truth. In our view, this position assumes the ultimate conclusion that the confession was voluntary, and merely begs the question whether the trial court's decision was based on the totality of circumstances as revealed by all of the material witnesses.

In *People v. Sloss* (1952), 412 Ill. 61, 104 N.E.2d 807, the defendant alleged that he had been beaten by the police and that he made a contemporaneous complaint of the beating to an assistant State's Attorney. Our supreme court reversed the defendant's murder conviction and held that the statement should have been suppressed, in part because the State failed to produce the assistant State's Attorney. (412 Ill. 61, 71-72, 104 N.E.2d 807.) In *Sloss,* every officer who testified denied the defendant's version of events, but the supreme court reasoned that the defendant was entitled to the trial court's scrutiny of all of the circumstances. (412 Ill. 61, 69-71, 104 N.E.2d 807.) We believe that defendant was entitled to no less in this case.

The cases relied upon by the State are distinguishable. In *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672, our supreme court held that the failure to produce a material witness was not reversible error where defendant's motion to suppress failed to identify the essential witnesses, where the State offered to call additional witnesses if allowed a continuance, and where defense counsel equivocated as to the need to call such witnesses. (*In re Lamb* (1975), 61 Ill. 2d 383, 392, 336 N.E.2d 753.) By contrast, defendant in this case reasonably identified Edwards and Abran as material witnesses, and entered a specific objection to the State's failure to produce them. In *People v. Beamer* (1978), 59 Ill. App. 3d 855, 376 N.E.2d 368, and *People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30, this court found that the defendants failed to indicate what material knowledge the named witnesses possessed. Here, however, defendant testified that Abran was present when Holz threatened her, and that she made a contemporaneous complaint to Edwards. Abran and Edwards were material witnesses to these facts as well as the physical, mental and emotional condition of defendant.

We recognize that the material witness rule has been criticized as too technical. Justice Underwood advocated a test based upon the substantial value of the testimony in resolving the question of voluntariness. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 477-78, 282 N.E.2d 712 (Underwood, J., dissenting).) And Justice House earlier suggested a discretionary rule. (*People v. Sims* (1961), 21 Ill. 2d 425, 433-35, 173 N.E.2d 494 (House, J., specially concurring), *cert. denied* (1962), 369 U.S. 861, 8 L. Ed. 2d 19, 82 S. Ct. 951.) We note that the majority of the court adhered to the materiality standard, and we believe wisely so. Without knowing the content of the testimony, a trial court could assess "substantial value" or exercise "discretion" only by guessing. Review would be meaningless, for this court could only rubberstamp or second-guess such a decision.

This case illustrates the need for principled application of the materiality standard. The State posits that the testimony in question "would not have changed the outcome of the suppression hearing." This argument assumes either that Edwards and Abran would deny defendant's allegations, or that the trial judge would disregard testimony corroborating her allegations. Both assumptions are repugnant to the material witness rule, which requires the State to produce witnesses *before* the trial court weighs the evidence. Assume rather that Abran testified that Holz did threaten defendant, and assume further that Edwards testified that defendant appeared very distraught and told him that she had been threatened. Can the State truly argue that the outcome of the hearing would have been the same?

Of course, it would be better to know the testimony than to guess or assume what it would be, but Edwards and Abran are the only ones who know what they saw or heard or did, and they did not testify. Given the importance of assuring that only voluntary confessions are used against defendants, we see no unfairness in requiring the State to produce or excuse all material witnesses. The burden is heavy, but not oppressive. Defendant must raise genuine issues of voluntariness, must identify material witnesses, and must specifically object to the State's failure to produce such witnesses. Even so, the State is released from the rule if it can show that a particular witness is unavailable. The State, understandably, urges an interpretation that would allow it to choose its witnesses, but we believe that the State's interpretation would render the rule a nullity, and we decline to take such a step.

We conclude that Edwards and Abran were material witnesses. Although the State does not argue the point on appeal, we would find that Abran's absence was excused by his hospital stay. However, the

State has made no attempt to explain Edwards' absence. Accordingly, we hold that the introduction of defendant's statement was error, and we remand this case for a new trial. The remainder of defendant's contentions are based upon events which are unlikely to recur, or factual matters best addressed after a new trial, and so we do not reach them.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

MEJDA, P.J., concurs.

JUSTICE SULLIVAN, dissenting:

The majority, while concluding that Abran and Edwards were material witnesses who should have been produced at the suppression hearing, also made a finding "that Abran's absence was excused by his hospital stay." Thus, reversal is based solely on the majority holding that Edwards was not produced. I disagree with the holding that Edwards was a material witness who should have been produced.

The majority concludes without reference to any record testimony that Edwards was a material witness because (1) "defendant claimed that Edwards took a statement from her and her testimony is corroborated by Frost and McNally"; (2) Edwards "could say whether or not defendant appeared fatigued, strained or agitated" and (3) defendant complained to Edwards that she was threatened.

Concerning the first conclusion, the record discloses that in answer to the question "did you make any statement concerning the incident while Edwards was in the room?" she answered, "I don't recall." No witness testified that defendant gave a statement concerning the occurrence to Edwards and no statement made by defendant to him or given in his presence was introduced or even mentioned at trial. Moreover, McNally gave no testimony that defendant made any statement to Edwards concerning the appearance, and Frost did not know whether she gave any such statement to Edwards. Frost stated only a belief that Edwards may have said he had taken a statement from defendant. In addition, McNally stated that no prosecutor was present at any time while he was in the room with defendant.

Concerning the second conclusion of the majority; namely, that Edwards could have testified as to whether defendant was "fatigued, strained or agitated" it is noted that neither defendant nor any other

witnesses so testified. More particularly, defendant gave no testimony nor did anyone else that when she gave the court-reported statement to Frost she was "fatigued, strained or agitated."

Concerning the third conclusion of the majority; namely, that Edwards could have testified as to whether or not threats had been made to the defendant, it is noted that there is nothing to indicate that there were any threats to or coercion of defendant in any form in the presence of Edwards and defendant did not testify that she gave the court-reported statement because of any threats or coercion. The only reference in this regard appears in the answer by defendant to questions of her attorney that when she was in a room at the police station Edwards came in alone[1] and she said to him "they told me if I didn't say that I may have hit my children with a bat, they were going to take them away, and he just said 'what' and that's when Dwyer and the youth officers came in and I just said 'never mind' because I didn't want to get into any deeper trouble. I don't know whether he heard it or not \*\*\*." It is clear, however, that Edwards was not present when any threat was made to her and could not have been since defendant said that the only time she saw him was when she made this particular comment and at that time they were alone in the room. All other witnesses testifying at the hearing and at trial denied that any threat was made to take her children from her and, significantly, defendant did not testify that she gave the court-reported statement because of any threats.

Under the circumstances, there is no justification for a reversal on the basis that Edwards was a material witness who should have been produced because he might have been able to testify as to her physical condition and whether she had told him of a threat where there is no testimony by defendant that her physical condition had anything to do with her giving the court-reported statement or that she gave it because of any threats.

Contrary to the statement of the majority, I believe that *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672, is controlling. In that case, an assistant State's Attorney, who took a written statement from defendant, did not testify at the hearing to suppress the motion. There was no claim of coercion at the time the statement was given but it was contended by defendant that he was in fear of physical

---

[1]It appears from defendant's testimony that Edwards came into the room about 6:30 p.m. on September 22, whereas defendant's court-reported statement was given to Frost at 9:10 p.m. on that day.

abuse by police officers if he refused to give the statement. The supreme court stated:

> "This court has interpreted the 'material witness' rule to mean that 'where there was no claim of coercion at the time a written confession was executed, but only the claim by the defendant that he was in fear of further beatings, the State [is] not required to call all of the witnesses present at the time the defendant signed the confession.' [Citations.]" (*In re Lamb* (1975), 61 Ill. 2d 383, 389-90, 336 N.E.2d 753, 757.)

Here, Edwards was not present and, in fact, was no longer working on the case when the court-reported statement of defendant was taken by Frost and there is nothing in the record to indicate any claim by defendant of coercion at the time she gave the court-reported statement. There is only her claim that she was told sometime before she gave the statement that her children would be taken from her. Thus, to the extent that she may have feared that this would occur if she did not make the statement, the situation is similar to that in *Lamb* where the defendant stated that he feared further physical abuse by police officers if he didn't give the statement.

*People v. Sloss* (1952), 412 Ill. 61, 104 N.E.2d 807, relied upon by the majority, is clearly distinguishable. There it was undisputed that defendant made a complaint concerning threats and physical beatings to the assistant State's Attorney and that the latter not only saw a physician examining defendant but he was also in charge of the reenactment of the crime and conducted the questioning leading to defendant's reenactment statement, and even prior to that questioning defendant protested to the assistant State's Attorney concerning the duress applied to him. The court held that the reenactment statement followed so closely and was so directly related to the first confession that the statement could not been deemed voluntary unless the initial confession was itself voluntary and, under the circumstances, the assistant State's Attorney was a material witness who should have been produced. There are no such contacts by Edwards in the case before us.