THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* CONFESOR MELÉNDEZ SANTOS, Defendant and Appellant.

No. 16208. Resubmitted September 2, 1958.—Decided October 24, 1958.

*Carlos J. Irizarry Yunqué* and *Jesús B. Rodríguez López* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

760

Confesor Meléndez Santos urges the reversal of the sentence of fifteen to thirty years' imprisonment in the penitentiary imposed on him by the Superior Court, Ponce Part, for the crime of second-degree murder. He maintains that the lower court erred in denying a change of venue; in failing to order that he be tried separately from the other two codefendants in the case, and in admitting in evidence a sworn statement and some alleged verbal statements made by defendant without it having been proved that they were voluntarily made. We consider that appellant's third assignment is correct and, therefore, the judgment appealed from will be reversed. For this reason, and considering the facts of this case which we shall immediately recite, we find it unnecessary to decide the other two questions.

The district attorney accused Confesor Meléndez Santos, Francisco Soto Delgado, and Hermenegildo Ramos Rivera, of having unlawfully killed Eulalia Toro Muñoz on May 29, 1955, on the road leading from Guayanilla to Ponce, site known as Salistral, "acting jointly and in common agreement, with premeditated malice, deliberation, and with the firm and deliberate intent" of killing. When the case was called for trial on February 14, 1956, the judge of the lower court denied a motion for a change of venue [1] and a motion for separate trial [2] filed by Meléndez Santos. The jury was

[1] The motion for a change of venue is governed by § 172 of the Code of Criminal Procedure (34 L.P.R.A. § 432), which provides that it must be made " . . . in open court and in writing, verified by the affidavit of the defendant or of the prosecuting attorney, as the case may be, a copy of which application must be served upon the attorney of the adverse party at least one day prior to the hearing of the application. . . ." In *Maldonado* v. *Superior Court*, 71 P.R.R. 502 (1950), we explained the scope of that section and cited with approval, among others, *People* v. *Yoakum*, 53 Cal. 566 (1879).

[2] The granting of a separate trial rests with the sound discretion of the court— § 238 of the Code of Criminal Procedure (34 L.P.R.A. § 717); *People* v. *Muñiz*, 77 P.R.R. 808, 810 (1955); *People* v. *Ortiz*, 76 P.R.R. 241, 247 (1954); *People* v. *Clemente*, 35 P.R.R. 575 (1926); *People* v. *Arrocho*, 34 P.R.R. 809 (1926), affirmed in 16 F.2d 90, *cert. denied*, 273 U. S. 760 (1926). Nevertheless, in several American jurisdictions, and interpreting provisions similar to ours, where one of several defendants

impanelled and the district attorney began to introduce his evidence after the three defendants had pleaded not guilty.

The medical testimony proved that the victim had died of traumatic shock and that she had sustained fractures and lacerations in the right front-parietal bone and fractures in three ribs. She had a three-fourths inch wound in the vagina, but the hymen was intact and she had not been deflowered. It also showed that Meléndez had wounds in his face and in his back and that he had said that those wounds had been inflicted with fingernails. Other testimony proved that (1) the victim was physically well on the morning of the day of the events; (2) the three defendants had been drinking near the scene of the crime that night and there had been fights between Meléndez and Ramos and Meléndez and Soto; (3) that night, near the scene of the crime, a woman's voice was heard crying "Don't hit me any

jointly indicted has made admissions or confessions implicating others, a severance must be ordered, unless the district attorney declares that such admissions or confessions will not be offered in evidence. Other courts of appeal have refused to accept that ruling, adopting the principle that the court can clear the situation satisfactorily by giving proper instructions to the jury. Concerning the problem, examine: *People v. Casanova*, 77 P.R.R. 690, 696 (1954); *People v. Sweetin*, 156 N.E. 354 (Ill. 1927); *People v. Buckminster*, 113 N.E. 713 (Ill. 1916); *People v. Carmichael*, 145 N.E. 673 (Ill. 1924); *People v. Bolton*, 171 N.E. 152 (Ill. 1930); *People v. Patris*, 196 N.E. 806 (Ill. 1935); *Davis v. People*, 43 Pac. 122 (Col. 1895); *People v. Rupert*, 146 N.E. 456 (Ill. 1925); *People v. Sweeney*, 136 N.E. 687 (Ill. 1922); *People v. Lindsay*, 107 N.E.2d 614 (Ill. 1952); *People v. Feolo*, 26 N.E.2d 256 (N.Y. 1940); *Krulewitch v. United States*, 336 U.S. 440, 453 (1949); *Anderson v. United States*, 318 U.S. 350, 351 (1942); *Delli Paoli v. United States*, 352 U.S. 232, 247 (1957); *Nash v. United States*, 54 F.2d 1006, 1007 (C.C.A. 2, 1932); *United States v. Pugliese*, 153 F.2d 497, 501 (C.C.A. 2, 1945); *United States v. Haupt*, 136 F.2d 661 (C.C.A. 7, 1943); *United States v. Gottfriend*, 165 F.2d 360, 367 (C.C.A. 2, 1948); *Schaffer v. United States*, 221 F.2d 17 (C.C.A. 5, 1955); *People v. Doran*, 159 N.E. 379 (N.Y. 1927); *People v. Fisher*, 164 N.E. 336 (N.Y. 1928); *People v. Snyder*, 159 N.E. 408 (1927); *People v. Santo*, 273 P.2d 249 (Cal. 1954), *cert. denied*, 348 U.S. 959 (1955); *State v. Ríos*, 112 A.2d 247 (N.J. 1955); *Kirkendoll v. State*, 281 S.W. 2d 243 (Tenn. 1955). See, also, the commentaries on the *Delli Paoli* case, in 43 Cornell L.Q. 128 (1957); 10 Vanderbilt L. Rev. 859 (1957); and 56 Col. L. Rev. 1112 (1956), and the annotation *Right to severance where codefendant has incriminated himself*, in 54 A.L.R.2d 830.

more, don't hit me any more"; (4) the victim, upon being aided by the police, stated that a group of men, white and colored, had beaten her and that "there is a dark one that is probably scratched"; and (5) the shirt that Meléndez had worn the night of the events had human blood stains. It was proved that at daybreak of the following day, Meléndez had taken the shirt to his *comadre* to be washed, but that she did not do it and later gave it to the detectives.[3]

After the jury withdrew, the district attorney called detective Francisco Vázquez, to the witness stand and he testified as to the manner the confessions of Meléndez and Soto had been obtained, but did not say anything as to Ramos' testimony. The defense then produced witness José Luis López, from the editorial staff of "El Día" newspaper. He testified as to some events that occurred in the police station when the defendants were being questioned there. Later the court admitted in evidence the testimony of the three defendants, over the repeated objections of the defense. Those statements having been admitted, the three defendants expressly waived their right of trial by jury and the trial continued to be held by the court without a jury.

Under these circumstances the defense introduced its evidence which consisted mainly of the testimony of four persons that placed Ramos, prior to the commission of the crime, in a public vehicle leaving the scene of the crime and heading towards the city of Ponce. Three issues of "El Día" newspaper containing information on the events were also admitted.

The court found the three defendants guilty of the crime of murder in the second degree, stating in so doing that "this is a case where the only evidence against the defendants (and

---

[3] Together with other pieces of evidence some photographs were admitted which showed the defendants at the scene of the crime, in custody of the police. The district attorney tried to offer in evidence some trousers stained with semen, alleging they were the ones worn by Meléndez the night of the events, but decided to withdraw them when the defense objected. (Tr. Ev. at pp. 345–46.)

I do not mean that it is poor evidence) is the sworn statement of Confesor Meléndez and Francisco Soto." (Tr. Ev. at p. 388.) Francisco Soto did not appeal from the sentence imposed upon him. Hermenegildo Ramos appealed and we reversed the judgment because the record did not contain "evidence beyond a reasonable doubt to support his conviction." [4]

 The record of this case shows that Meléndez Santos' confession was produced under the following circumstances: On May 31, 1955, at about 8 a.m., Francisco Soto Delgado was arrested "for investigation" and taken to the police station. Soto admitted at once having participated in the crime and from the information that he gave the police, Confesor Meléndez Santos and Hermenegildo Ramos were also arrested "for investigation." Meléndez' arrest took place on the very 31st at about 9 a.m., while he was leaving a wake. Detective Francisco Vázquez took him to the police station and upon arriving, Meléndez met Soto, who in front of several policemen and other persons told him that he (Soto) had testified and was witness for The People and advised Meléndez to do the same. From that moment until next morning, Meléndez was submitted to interrogation conducted in relays [5] and in which at least five armed policemen [6] and one district attorney participated.[7] At no time was he advised of his right not to testify or that his testimony could be used against him. During all that time (approximately 22 hours) Meléndez was under custody at the police station

---

[4] Judgment of this Court of June 4, 1957.

[5] Detective Vázquez testified: "When one would began to talk, there would only be one at a time while the other waited outside.
"You would come and talk?
"Yes, sir.
"You would then leave and another one would come?
"Yes, sir." (Tr. Ev. at p. 249.)

[6] Captain Ernesto Lugo Méndez, Lieutenant Luis V. Costas, detectives Ramón Negrón, Francisco Vázquez, and Rafael Rivera Rosario. Also corporal Radamés Pierantoni "advised" in the investigation and the interrogation.

[7] District Attorney Julio Fernández Cabrera.

without having an opportunity to confer with relatives, friends or counsel.[8] Next day he was served a *"mixta"* * for lunch, then a dinner and breakfast consisting of coffee, bread and butter. He drank water, washed his mouth and face, and took a bath. There is no evidence that he slept during the time he was detained. Detective Vázquez testified, referring to the defendants, that "I do not know if they slept or not. We rested and so did they." (Tr. Ev. at p. 258.) The "rest" took place on a wooden bench. Considering Vázquez' testimony to the effect that the questioning lasted until Meléndez stated that he had participated, and that it continued day and night until the morning of the first of the month (Tr. Ev. at pp. 237–38), we must conclude that Meléndez did not sleep during the time he remained at the police station.[9]

Vázquez testified that the questioning was conducted in a normal tone of voice and without physical punishment, threats, or promised benefits. The accused remained all the time "with his head bowed" and silent, except when he spoke to deny his participation in the crime. He "always" an-

---

[8] "Do you mean to say that at all times, Confesor, the accused, remained with some one from the detective or the police?

"Yes, sir, in custody.

"What sort of work were they doing with him?

"Investigating him and questioning him about the case.

"Those questions, how regularly were they asked?

"He was asked one question now and another one some time later.

"Who participated in that interrogation?

"Myself, the captain, Lieutenant Costas, detective Negrón, detective Rivera. One questioned him first and then another.

"In that series of questions, which were some times put by the captain, and another times by Lieutenant Costas, detective Rivera, and yourself, who else participated in that questioning?

"Detective Negrón.

"Did District Attorney Fernández Cabrera also participate?

"Yes.

"Anyone else?

"I do not recall anyone else." (Tr. Ev. at pp. 235–36.)

* A mixture of rice and beans and stew as a single order.

[9] It is also partially proved by the fact stated hereinafter that when Vázquez went to rest at 1:30 in the morning, other persons continued questioning Meléndez.

swered: "The other one wants to get me into this but I did not commit the crime." [10] (Tr. Ev. at pp. 231, 240, 257.)

"Notwithstanding his insistence that he had nothing to do with that, you kept saying to him, again and again, 'it is you'?

"Yes, sir. In that same manner until I convinced him, and he told me the truth." (Tr. Ev. at p. 240.)

Vázquez added that he continually said to the defendant: "If this one accuses you, why do you deny that you went to that place and committed that crime? Why don't you give up and quit making us work?" (Tr. Ev. at p. 240.)

"We are already tired of this case." [11] (Tr. Ev. at p. 250.)

The persons in charge of the questioning, with the exception of the district attorney, carried firearms. Vázquez admitted that in the past on several occasions he had struck several persons in the course of official investigations— "to defend myself" —but that there had never been any charges made against him. On one occasion he was accused and acquitted.

During the night of May 31, while Meléndez was being questioned, many persons assembled [12] in front of the police station and made hostile comments about the prisoners. Some of those persons entered the station, others remained outside. The police made no effort whatsoever to comply with their clear duty of dispersing the crowd and prevent-

---

[10] "Until that moment, until the morning of the first of the month, he had not said anything to anyone?

"No. Only that the other one said that he was there too." (Tr. Ev. at pp. 230–31.)

[11] Witness José Luis López added the following: "When questioned, they promised to talk later on. The promise was to the police. 'I will testify later, let me rest a while.'" (Tr. Ev. at p. 280.)

[12] Detective Vázquez said that a "crowd" assembled commenting "What a crime!" but that there was no need to call their attention. (Tr. Ev. at pp. 252–53.) Witness José Luis López estimated that there were from 50 to 75 persons, at no time "more than one hundred" and that "they were talking against the three of them." (Tr. Ev. at pp. 282–83.)

ing persons hostile towards Meléndez from entering very near the room where he was being questioned. Considering the room wherein the prisoner was being interrogated and the fact that the doors and windows of the police station were open, and the noise that must have been necessarily produced by about seventy-five persons talking to each other, we must unavoidably conclude that Meléndez was aware of a mob clamor against him.

Vázquez testified that about one-thirty in the morning he went to rest, while "the other persons" continued interrogating Meléndez (Tr. Ev. at p. 255), and that the following morning between seven-thirty and eight when he returned to work, the accused, after having had his breakfast, and having washed his mouth and face and having been told that the "other one" had confessed, said to him: "Well, I'm going to tell the truth, as the thing happened." (Tr. Ev. at 248.) Vázquez did not state what Meléndez told him.[13] There was no one else present at that moment. At nine o'clock several officers took him to the place of the crime, where he stayed the whole morning together with Soto and Ramos, always surrounded by the police and police photographers and without being able to communicate with third persons. Vázquez testified that there Meléndez indicated the scene of the crime, but none of the photographs taken show that action, while in several photographs Soto, the other prisoner, appears making gestures. Vázquez explained that no photograph whatsoever was taken of Meléndez while the latter was pointing out and besides that Meléndez remained silent while Soto indicated the spot.[14]

At two o'clock in the afternoon of that same day Vázquez took Meléndez, after the latter had lunch, to the office of the district attorney Fernández Cabrera, where he gave

---

[13] Vázquez did not explain at any moment what Meléndez said on this occasion. Formerly he had testified: "Confessor told me what he had done on the morning of the first of the month." (Tr. Ev. at p. 230.)

[14] Tr. Ev. at pp. 304–315.

a sworn statement which lasted until five-thirty. Vázquez witnessed the interview with the district attorney and testified that the prisoner was not beaten, threatened or promised anything when he testified and that his testimony was voluntary and that he was "tranquil." Three other persons were present on that occasion [15] but none of them testified at the trial. Then Vázquez took Meléndez again to the station where he ate and his fingerprints were taken. Later on he took him before a judge. On the night of that same day—approximately 36 hours after his arrest [16]—the prisoner was put in jail by judicial order.

After examining the *entire official conduct* in this case and *the defendant's personal circumstances,* we are convinced that Meléndez Santos' confession was obtained by psychological coercion. In view of the fact that in the cases of *People* v. *Fournier,* 77 P.R.R. 208 (1954), *ante,* p. 376, we made an exhaustive analysis of the subject matter, it is unnecessary to overburden this opinion with a recital of the applicable principles and rules. It suffices to remember that it is incumbent on this Court, irrespective of the conclusion of the trial judge, to determine, in the light of the admitted or undisputed facts and the fair inferences emanating therefrom, whether the defendant's confession was obtained by means of physical or psychological coercion in violation of the constitutional clause of due process of law. We comply with such delicate responsibility by the "weighing of the circumstances of pressure against the power of resistance of the person confessing." *People* v. *Fournier, ante,* p. 405. We therefore pass on to enumerate the elements constituting coercion in this case and the precedents supporting them.

---

[15] Two employees of the office of the district attorney and an individual who had been marshal and had served as witness of defendant's mark put on the statement. Vázquez could not specify the exact hour when Meléndez' testimony was taken. (Tr. Ev. at p. 225.)

[16] Vázquez could not specify either the exact hour when Meléndez was committed to joil. (Tr. Ev. at p. 259.)

1) Illegal detention for approximately thirty-two and one-half hours from the arrest until the moment the prisoner placed his mark on the confession. *People* v. *Fournier*, 77 P.R.R. 208, 247, 250; 80 P.R.R. 435; *Payne* v. *Arkansas*, 356 U.S. 560, 563 (1958); *United States* v. *Jackson*, 256 F.2d 7, 12 (C.C.A. 2, 1958).

2) During that same number of hours the accused remained without sleep.[17] *Ashcraft* v. *Tennessee*, 322 U.S. 143, 153 (1943); *United States* v. *Jackson, supra* at 12.

3) Interrogation by five armed policemen [18] and a prosecuting attorney, using the relay system. *Ashcraft* v. *Tennessee, supra* at 149; *Harris* v. *South Carolina*, 338 U.S. 68, 69 (1949); *Watts* v. *Indiana*, 338 U.S. 49, 52 (1949); *Turner* v. *Pennsylvania*, 338 U.S. 62, 63 (1949). *Cf. Stein* v. *New York*, 346 U.S. 156, 185 (1946).

4) Interrogation during one whole day and one night, which was interrupted only when the prisoner agreed to testify. Aside from some "rests" on a wooden bench, Meléndez was answering questions for about twenty-two consecutive hours. Later he was taken under police custody to the scene of the crime and thereafter he testified for about three and one-half hours before the district attorney and several police officers and employees of the office of the district attorney. *Ashcraft* v. *Tennessee, supra* at 153; *United States* v. *Jackson, supra* at 12; *State* v. *Crittenden*, 36 So. 2d 645, 647 (1948); *State* v. *Roberson*, 103 So. 283, 286–87 (1925).

---

[17] It is presumed, besides, that Meléndez Santos had been several hours without sleep prior to his arrest, since he was arrested upon leaving a wake. In *People* v. *Fournier*, 80 P.R.R. 416–445, particularly p. 439, the oral testimony and the photographic evidence prove definitively that the lack of sleep did not affect the prisoner's physical and mental faculties. In the case at bar such evidence does not exist and, therefore, we have to rely on the natural consequences of fatigue and exhaustion produced by the prolonged lack of sleep. See footnote 27, *infra.*

[18] A confession is not rendered involuntary only by virtue of the fact that the officers in charge of the accused appear armed or showed the latter arms. See *Hornsby* v. *State*, 10 So. 522 (Ala. 1892); *Stevens* v. *State*, 35 So. 122 (Ala. 1903); *Tait* v. *State*, 65 So. 2d 208 (Ala. 1953), and footnote 23, *infra.*

5) From the arrest until he signed the confession (thirty-two and one-half hours) the prisoner was held incommunicado from his relatives, friends, and persons not belonging to the police, had no legal assistance and always remained in custody of the police. He was not advised of his right not to testify until several hours after his resistance had been broken and he had made a statement to Vázquez and, consequently, when he was subject to the psychological and practical disadvantages of such conduct.[19] *Malinski* v. *New York*, 324 U.S. 401, 405 (1945); *Turner* v. *Pennsylvania, supra* at 64; *Payne* v. *Arkansas, supra* at 567; *United States* v. *Jackson, supra* at 16; *cf. United States* v. *Bayer*, 331 U.S. 532, 540 (1946).

6) Pressure produced by the presence of a hostile mob. While part of the questioning was taking place, a good number of persons assembled in front of the police station making hostile comments about the prisoners. Some of those persons entered the police station. *Cf. State* v. *Whiteman*, 67 N.W.2d 599 (N.D. 1954); *Payne* v. *Arkansas, supra* at 564; *Thomas* v. *Arizona*, 356 U.S. 390 (1958); *People* v. *Crabb*, 24 N.E.2d 46, 49 (1939).

7) Limited psychological capacity of the defendant to resist the pressure to which he was submitted—he is a sugar cane cutter, illiterate, poor, unaware of his rights as defendant [20] and with experiences only in his own social sphere. *Ashcraft* v. *Tennessee, supra* at 148; *Harris* v. *South Carolina, supra* at 70; *cf. Haley* v. *Ohio*, 332 U.S. 596 (1948);

---

[19] "... Holding the suspect incommunicado furnishes the setting most favorable for obtaining a confession. A high percentage of improperly induced confessions occur while the suspect is being held 'on ice' in violation of arraignment statutes. ..." Wicker, *Some Developments in the Law Concerning Confessions*, 5 Vanderbilt L. Rev. 507, 511 (1952).

[20] The evidence shows that Meléndez Santos had been convicted formerly of the crime of attack to commit homicide and had been in prison "one to two years." (Tr. Ev. at p. 396.) This isolated sentence and the defendant's legal age are clearly insufficient to maintain that we have before us a person conscious of his rights, capable of defending them, and accustomed to dealing with the police.

*Fikes* v. *Alabama*, 352 U.S. 191, 193 (1957); *Payne* v. *Arkansas, supra* at 567; *State* v. *Peterson*, 75 A.2d 368, 371 (1950); *State* v. *Bernard*, 106 So. 656, 657 (1925); *State* v. *Robinson*, 41 So. 2d 848, 851 (1949); *State* v. *Phelps*, 69 So. 856 (1915); *Crooker* v. *California*, 357 U.S. 433 (1958).

In short, the circumstances that we have analyzed manifestly show that a confession was wrung from Meléndez Santos by means of uninterrupted and unrelenting psychological pressures exercised by the investigating officials. That coercion, composed of all those elements that we have outlined,[21] commenced from the very moment of his illegal detention and was prolonged with all its cruel effects for nearly one and one-half day, some of its elements persisting even after the prisoner had confessed. Vázquez' testimony to the effect that he questioned Meléndez in a tranquil manner and in a normal tone of voice[22] and that the district attorney did the same thing later, can not militate against that conclusion, especially when such explanations must be

---

[21] Although independent evidence of the veracity of a confession obtained by means of coercion does not destroy its involuntary nature or renders it admissible—*People* v. *Fournier*, 77 P.R.R. 208, 261; *Payne* v. *Arkansas, supra* at 567—an analysis of the testimony of the three defendants in this case shows important contradictions as to the manner in which the events occurred, which adds another element of doubt as to the voluntariness of appellant's testimony. *Cf. State* v. *Peterson, supra; United States* v. *Jackson, supra.*

[22] In view of the fact that it clearly arises from the testimony of Vázquez and López that Meléndez' confession was involuntary, we have not stopped to consider the fact that the evidence for the prosecution did not explain what happened to Meléndez while he was being questioned by several police officers and the district attorney outside of Vázquez' presence. In some American jurisdictions it is the duty of the trial judge in every case, when he has reason to suspect that a confession has been wrung from the defendant by illegitimate means, to absolutely refuse to permit any evidence as to the confession until everyone present at such examination has testified. See *People* v. *Rogers*, 136 N.E. 470, 475 (Ill. 1922); *State* v. *Green*, 60 So. 2d 208, 214 (La. 1952); *People* v. *Cope*, 178 N.E. 95, 98 (Ill. 1935); *People* v. *Thomlison*, 81 N.E.2d 434, 437 (Ill. 1948); *People* v. *Mummiani*, 180 N.E. 94, 97, 98 (N.Y. 1932); *People* v. *Sloss*, 104 N.E.2d 807 (Ill. 1952). *Cf. Hopt* v. *Utah*, 110 U.S. 574, 585 (1884); *Redwine* v. *State*, 61 So.2d 715, 719 (Ala. 1952).

taken with a "grain of salt" in view of the disregard shown by the investigators towards defendant's rights. *Cf. Haley* v. *Ohio, supra* at 600.

It is impossible to find in the vast jurisprudence dealing with confessions two identical cases. There are always variations either in the official conduct or in the arrested person's personal circumstances. Nevertheless, we believe that *United States ex rel. Santo Caminito* v. *Murphy*, 222 F.2d 698 (C.C.A. 2, 1955), *cert. denied*, 350 U.S. 896 (1955), is so strikingly similar to appellant's case that we feel it is our duty to outline it in detail.

The defendant ("humble, inconspicuous") was detained during an investigation of a crime of murder. The proven facts, as established in Judge Jerome Frank's opinion, were the following:

"(1) Caminito was taken into custody by the police on Sunday, May 11, 1941 at 6 P.M.

"(2) Commencing about 9 P.M. Sunday, he was continuously interrogated by five or six police officers for a period of approximately five hours, until 2 A.M. the following morning, Monday, May 12th.

"(3) At 3 A.M. on Monday, May 12th, he was locked in a cell in which there were no bed, blankets, spring or mattress, but only a wooden bench. (He testified that the cell was unheated. A witness for the State testified that the cell was equipped with a radiator but that he 'did not know if the heat was on' during the time Caminito was there confined.)

"(4) At 10 A.M. on Monday, May 12th, the questioning was resumed. The interrogation continued all day, with several detectives taking turns.

"(5) Members of Caminito's family, his friends and an attorney retained by the family, called at the station house where he was detained and tried to get information concerning his whereabouts. The police officers knew these facts, but kept him incommunicado. Other than the police and the District Attorney, no one was permitted to see him until he was arraigned forty hours after being taken into custody.

"(6) During the afternoon of Monday, May 12th, two women and a man were brought in to face Caminito. He was

not told that they were detectives. Each falsely pretended to identify him as the person who was sitting at the wheel of the automobile at the time of the shooting, which occurred in connection with the holdup.

"(7) About 9 P. M., Monday, May 12th, twenty-seven hours after having been taken into custody, he signed a confession. He gave a second confession to a District Attorney a short time later." (At 699–700.)

Judge Frank added: "Alone or together, neither the unlawful detention for many hours nor the deceit in confronting Caminito with disguised police officers who lied in identifying him would suffice to vitiate the confessions as unconstitutionally obtained. But those factors did aggravate the following unconstitutional practices which—*even in the absence of those factors*—rendered the confessions inadmissible: (a) The police interrogated him almost continuously for 27 hours, with but a brief interval for rest in a cell so badly equipped as to make sleep virtually impossible for a man already harried by the questioning. (b) During this long period, the police, in effect, kidnapped him: They kept him incommunicado, refusing to allow his lawyer, his family, and his friends to consult with him. (At 700–701.) (Italics ours.)

" . . . . . . . . .

"All decent Americans soundly condemn satanic practices, like those described above, when employed in totalitarian régimes. It should shock us when American police resort to them, for they do not comport with the barest minimum of civilized principles of justice. It has no significance that in this case we must assume there was no physical brutality. For psychological torture may be far more cruel, far more symptomatic of sadism. Many a man who can endure beatings will yield to fatigue. To keep a man awake beyond the point of exhaustion, while constantly pummelling with questions, is to degrade him, to strip him of human dignity, to deprive him of the will to resist, to make him a

pitiable creature mastered by the single desire—at all costs to be free of torment. Any member of this or any other court, to escape such anguish, would admit to almost any crime. Indeed, the infliction of such psychological punishment is more reprehensible than a physical attack: It leaves no discernible marks on the victim. Because it is thus concealed, it has, under the brutalitarian régimes, become the favorite weapon of the secret police, bent on procuring confessions as a means of convicting the innocent." (At 701.)

If the facts of the *Caminito* case are compared with what happened to Meléndez Santos, it will be observed that, except for the false identification, the elements of coercion present in both cases are the same—illegal detention, continuous interrogation and in relays, absolute incommunicado detention until the confession is obtained,[23] lack of many hours' sleep, and limited psychological capacity of the prisoner to resist.[24] Meléndez' situation is made worse by the fact that the number of hours that elapsed between the illegal arrest and the written confession was greater than in *Caminito's*

---

[23] In the *Caminito* case several persons insisted on seeing the prisoner but the police refused; in the case at bar Meléndez neither requested to see any person whatsoever nor did anyone request to see him. The difference is unimportant. As Judge Lumbard said in *United States* v. *Jackson, supra* at 16: ". . . When law enforcement officials create a situation where those in their custody have no means of communicating with the outside world and no way of calling their plight to the attention of any disinterested persons for as long as 23 hours, common sense requires that we conclude that the observance of the constitutional rights of their prisoners was secondary to obtaining incriminating statements from those so isolated. . . ." The same reasoning is applicable to the failure of advising the prisoner of his right not to testify when the circumstances show that the person is not conscious of that right, *cf. People* v. *Fournier, ante,* p. 437, and even in situations wherein the advice is a mere ritual, *Haley* v. *Ohio, supra* at 601. Of course, we are not deciding that such elements alone and on every occasion suffice to determine that a confession is involuntary. We repeat that in cases of psychological coercion it is always necessary to examine the *whole* of the official conduct and the prisoner's *personal circumstances.*

[24] It is well to clarify that, contrary to Meléndez Santos, Caminito had never been arrested or sentenced for any crime. On the other hand, it is probable that Caminito was not illiterate, since he signed his confession.

case; that the latter's interrogation was suspended for seven hours (3 to 10 a.m. of Monday, May 12) while Meléndez' continued uninterruptedly until he made the oral admission; and that in the *Caminito* case there was no public pressure of any kind whatsoever while that element existed in the appellant's case herein.[25]

In *People* v. *Fournier*, 77 P.R.R. 208, 285–86; 80 P.R.R. 436, we emphatically expressed our repudiation of coercive methods directed to exact confessions from persons taken into custody.[26] Powerful reasons affecting the very essence of our judicial system support our attitude. Among them we enumerate the great probability that the confession might be false because it is solely the product of the confessor's desire to escape torture,[27] the possible violation of the con-

---

[25] The differences between the case of Meléndez Santos and the second confession of Ramón Antonio Fournier are so obvious, with respect to the official conduct as well as the personal circumstances of both defendants, that it seems unnecessary to outline them. Compare the résumé that we have made in this opinion with the one set forth in *People* v. *Fournier*, 80 P.R.R. 408–445.

[26] We also said the following: " . . . We do not hold that a district attorney may not question a defendant, either before or after arrest, for a reasonable time. Undoubtedly, interrogation of both suspects and witnesses is of great social value in the apprehension and conviction of those guilty of serious crimes. . . ." 77 P.R.R. 208, 276.

[27] This is necessarily a question of probabilities (except, of course, in the cases when the rest of the evidence establishes the falsity of the confession) for still no methods have been developed showing with *absolute certainty* that a confession in a concrete case was the product of mental or physical coercion and that, furthermore, it is false. See Mr. Justice Frankfurter's commentary in *Haley* v. *Ohio*, *supra* at 606: "Unhappily we have neither physical nor intellectual weights and measures by which judicial judgment can determine when pressures in securing a confession reach the coercive intensity that calls for the exclusion of a statement so secured. . . ." For this reason one must depend on an " . . . evaluation of psychological factors, or, more accurately stated, upon the pervasive feeling of society regarding such psychological factors. . . ." (At 605.) In a very interesting article entitled *Psycholinguistics and the Confession Dilemma*, 56 Col. L. Rev. 19 (1956), Richard Arens and Arnold Meadow suggest utilizing the psychological analysis of the language used in confessions to determine the impact of police pressure on the declarant. " . . . From the measurement and analysis of the impact exerted by the police technique upon the confession, the psycholinguistic expert erects that technique before the public view like

stitutional privilege against self-incrimination—*People* v. *Fournier*, 77 P.R.R. 208, 243, footnote 6—and the impact between those improper practices and such basic notions of justice as preclude a civilized community from inflicting mental or physical torture to prove its charges against a defendant. *Lisenba* v. *California*, 314 U.S. 219, 236 (1941); *Haley* v. *Ohio, supra* at 600, 605–07; *Malinski* v. *New York, supra* at 416–17; *Payne* v. *Arkansas, supra* at 567. Intimately bound to this elementary notion of justice is the effect that such practices necessarily have on those who employ them as well as on those who become their victims. For the former it may mean the easy road in criminal investigation, the manner of saving the effort and fatigue that accompany careful and exhaustive work. It constitutes necessarily a degrading and brutalizing influence that will imperceptively lead the officer to become cynical and disregard the guarantees of law and of constitution. In the latter, it will stimulate their antisocial behavior and destroy their confidence in the agencies charged with vigilance and investigation and eventually their faith in justice. The growth of such developments and the expansion of their sphere of action might, in view of the mutual influences between government and society, give rise to the imminent danger of a police state.

the paleontologist who reconstructs a prehistoric animal. . . ." (At 23.) It has also been suggested, that scientific methods be used to convey a more precise picture to the courts of the manner in which confessions are taken. 3 Wigmore on Evidence § § 833, 851 (3rd. ed. 1940) *Id.* § 251a (Supp. 1957) recommends equipping the police with sound film apparatus, and the promulgation of a rule declaring inadmissible in evidence all confessions not recorded in one of those films. In *People* v. *Hayes*, 71 P.2d 321 (Cal. 1937), that system was utilized and approved by the court. See, also, Wicker, *op. cit. supra* at 520. District Attorney Frank Hogan of New York, has launched the idea of using tape recorders to take prisoners' testimony—El Mundo, edition of July 30, 1958, at p. 23. Examine, lastly, John Kennedy, *Some Practical Suggestions for the Taking of Criminal Confessions*, 48 J. of Cr. Law, Crim. and Police Science 660 (1958), where there are valuable suggestions as to improving the technique of taking confessions, protecting the prisoner's rights at the same time, and Milton W. Horowitz, *The Psychology of Confession*, 47 J. of Cr. Law, Crim. and Police Science 197 (1956), in which psychological factors prompting the guilty ones to confess are described.

Nothing points to that danger now. In the last four years only two cases in which the use of coercion was proved have come up to this Court. In both, the dire circumstances of the crime and the pressure of social clamor were the cause of a short deviation in the conduct of the investigating officials. Certainly, we have no indication that the use of "third degree" methods has widely spread throughout our country as it did in the United States in the decade of the thirties and still exists in many localities of that nation.[28] However, this is no reason for relaxing the standards and the vigilance. Puerto Rico is undergoing a period of profound social and economic transformation. Parallel processes of industrialization, urbanization, economic growth and mass emigration are leaving indelible marks in its physiognomy. To these processes we must add the tensions produced by the last wars and the serious international situation. Although they do not constitute the only cause of crime, the fact is that historically those transformations and

[28] The report of the National Commission on Law Observance and Enforcement (1931) appointed by President Hoover, indicated that "Third degree—the inflicting of pain, physical or mental, to extract confessions . . . —is widespread throughout the country." The report of the President's Committee on Civil Rights (1947) appointed by President Truman, declared the following: "We have reported the failure of some public officials to fulfill their most elementary duty—the protection of persons against mob violence. We must also report more widespread and varied forms of official misconduct. These include violent physical attacks by police officers on members of minority groups, the use of third degree methods to extort confessions, and brutality against prisoners. Civil rights violations of this kind are by no means universal and many law enforcement agencies have gone far in recent years toward stamping out these evils." Part of these reports and more recent evidence on the problem are found in Emerson and Haber, *Political and Civil Rights in the United States* at 106–14 (1952). Even in England, which is justified in taking pride in having one of the most efficient and civilized systems of justice of the world, there have been recent transgressions of this kind. In its edition of August 2, 1958, the famous and internationally-known magazine *The Economist*, after outlining two cases wherein the police obtained confessions by psychological coercion (it having been established in one of them that the confession was false), expressed the following: "These cases, it should be emphasized, are not isolated. Time and again the methods of the police have come into prominence at criminal trials: long hours of questioning sometimes through the night,

tensions have been associated with a rise of criminality.[29] The statistics of recent years reveal that the same tendency exists in Puerto Rico.[30] The pressure of the number of

until mental resistance is lowered; promises that the accused will get off more easily if he confesses; threats of what will happen if he does not. There have been other occurrences—the alteration of a date in Lord Montagu's passport, for instance—that have never been explained. But when an accused is found guilty, any complaints made on his behalf against the police tend to be discredited. Now, however, the complaint comes from an undoubtedly innocent person, and this proved false confession must throw doubt on all confessions extracted by a similar process. The police seem to be as anxious to extract a confession as they are to obtain a conviction, perhaps to save themselves trouble, and to do so they resort to a form of what in other countries the British people rightly detest as brainwashing. There are now hard grounds for an inquiry into police methods; Parliament should insist on one." (At p. 360.)

[29] Glueck, *Crime and Correction* 1–23 (1952); Branham and Kutash, *Encyclopedia of Criminology* 47 (1949); Cohen (Ed.) *Youth and Crime* 124–45 (1957); The Columbia Encyclopedia 480 (2d ed. 1950); 4 Encyclopedia of the Social Sciences 563–69 (1948); Glueck and Glueck, *Unraveling Juvenile Delinquency* 3–7 (1950). According to an official report of the Federal Bureau of Investigations, in the United States in 1957 there was an estimate of 2,796,400 felonies, representing an increase of 233,250 over 1956 and of 23.9 per cent over the average for the five preceding years. *El Mundo*, April 24, 1958, at p. 32.

[30] *Crimes Occurring in Puerto Rico*
Years 1942–43 to 1956–57

| Years | Number of Crimes * | % increase over 1942–43 |
|---|---|---|
| 1942–43 | 112, 003 | |
| 1943–44 | 107, 434 | — 4. 08 |
| 1944–45 | 119, 546 | + 6. 74 |
| 1945–46 | 131, 695 | + 17. 58 |
| 1946–47 | 139, 789 | + 24. 81 |
| 1947–48 | 143, 885 | + 28. 46 |
| 1948–49 | 148, 013 | + 32. 15 |
| 1949–50 | 160, 022 | + 42. 87 |
| 1950–51 | 144, 503 | + 29. 02 |
| 1951–52 | 148, 747 | + 32. 81 |
| 1952–53 | 136, 418 | + 21. 80 |
| 1953–54 | 125, 382 | + 11. 95 |
| 1954–55 | 124, 239 | + 10. 93 |
| 1955–56 | 123, 877 | + 10. 60 |
| 1956–57 | 153, 018 | + 36. 62 |

* The numbers corresponding to the years 1942–43 to 1946–47 were supplied by the police headquarters of Puerto Rico. The ones corresponding to the years 1947–48 to 1956–57 were obtained from the Annual Report of the Police, p. 29, 1956–57.

crimes, the refinement of criminal methods, the lack of training in scientific crime detection, the rise of the professional criminal and the clamor of the public and the press in the future might easily induce the official investigators to indulge more frequently in physical or mental coercion to elicit confessions from arrested persons. Generally, the humble and forsaken,[31] as in the case at bar, would be the victims of those institutional or individual deviations. In order to contribute effectively to the constitutional and moral soundness of our system of justice it rests with the judiciary to reaffirm its unwavering abhorrence of such improper methods and its firm disposition to reject the use of its fruits.

The judgment appealed from will be reversed and the case remanded for new trial.

Mr. Justice Pérez Pimentel dissented.

---

[31] ". . . For repeated and unredressed attacks on the constitutional liberties of the humble will tend to destroy the foundations supporting the constitutional liberties of everyone. The test of the moral quality of a civilization is its treatment of the weak and powerless." Judge Jerome Frank in the *Caminito* case *supra* at 706.